# District of Columbia
# Court of Appeals

**Nos. 11-FS-1217, 11-FS-1218, 11-FS-1255, 11-FS-1256, 11-FS-1257, 11-FS-1258, 11-FS-1259 & 11-FS-1260**

IN RE TA.L.; IN RE A.L.; IN PETITION OF R.W. & A.W.;
    IN RE PETITION OF E.A.;
    A.H. AND T.L.

                    Appellants,



FILED
DEC - 8 2016
DISTRICT OF COLUMBIA
COURT OF APPEALS

ADA-115-09;
ADA-116-09;
NEG-235-08;
ADA-172-09;
ADA-173-09

On Appeal from the Superior Court
of the District of Columbia

BEFORE: WASHINGTON, *Chief Judge*; GLICKMAN, FISHER, BLACKBURNE-RIGSBY, THOMPSON, BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*; and REID, *Senior Judge*.

## JUDGMENT

    This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

    ORDERED and ADJUDGED that the judgment of the Superior Court is affirmed.

                  For the Court:

                  JULIO A. CASTILLO
                  Clerk of the Court

Dated: December 8, 2016.

Opinion by Chief Judge Eric T. Washington.

Associate Judge Anna Blackburne-Rigsby and Senior Judge Inez Smith Reid, joining in full; Associate Judge Phyllis D. Thompson, joining in Parts III and V (except for footnote 38) and the judgment; Associate Judges Stephen Glickman, John Fisher, and Roy McLeese, concurring in the judgment; and Associate Judges Corinne Beckwith and Catharine Easterly, joining in Parts III and IV, but dissenting from the judgment.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 11-FS-1217, 11-FS-1218, 11-FS-1255, 11-FS-1256, 11-FS-1257, 11-FS-1258, 11-FS-1259 & 11-FS-1260

IN RE TA.L.
IN RE A.L.
IN RE PETITION OF R.W. & A.W.
IN RE PETITION OF E.A.
A.H. AND T.L., APPELLANTS.

FILED 12/8/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeals from the Superior Court
of the District of Columbia
(ADA-115-09)
(ADA-116-09)
(NEG-234-08)
(NEG-235-08)
(ADA-172-09)
(ADA-173-09)

(Hon. Neal E. Kravitz, Trial Judge)

(Argued En Banc June 17, 2014                    Decided December 8, 2016)

*Tanya Asim Cooper*, with whom *Joyce Aceves-Amaya* was on the brief, for appellant E.A.

*Leslie J. Susskind* for appellant A.H.; *N. Kate Deshler Gould* for appellants A.H. and T.L.

*Melanie L. Katsur*, with whom *Matthew D. McGill*, *Lissa M. Percopo*, *Christopher B. Leach*, and *Lindsay M. Paulin* were on the brief, for appellees R.W. and A.W.

*Stacy L. Anderson*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for appellee the District of Columbia.

*Kelly Venci*, guardian ad litem, filed a brief in support of appellees R.W. and A.W.

*James Klein*, Public Defender Service, filed a brief as *amicus curiae* in support of appellants A.H., T.L., and E.A.

*Melissa Colangelo* and *Allen Snyder*, Children's Law Center, filed a brief as *amicus curiae* on limited issue and in support of neither party.

*John C. Keeney, Jr.*, Legal Aid Society of the District of Columbia, *Kyle J. Fiet*, and *David Reiser* filed a brief for *amici curiae* Legal Aid Society of the District of Columbia; National Association of Counsel for Children; Center for Family Representation, Inc.; Family Defense Center; and Family Law Professors Vivek S. Sankaran, Christine Gottlieb, and Martin Guggenheim in support of appellants A.H., T.L., and E.A.

*Richard P. Goldberg* and *Jeremy C. Doernberger* filed a brief for *amicus curiae* Dr. Robert S. Marvin in support of appellees R.W. and A.W.

*Douglas H. Hallward-Dreimeier* filed a brief for *amici curiae* Law Professors James G. Dwyer, J. Herbie Difonzo, Jennifer A. Drobac, Deborah L. Forman, William Ladd, Ellen Marrus, and Deborah Paruch, in support of appellees R.W. and A.W.

Before WASHINGTON, *Chief Judge*, GLICKMAN, FISHER, BLACKBURNE-RIGSBY, THOMPSON, BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*, and REID, *Senior Judge*.

Opinion by *Chief Judge* WASHINGTON, with whom BLACKBURNE-RIGSBY, *Associate Judge* and REID, *Senior Judge*, join in full; THOMPSON, *Associate Judge*, joins in Parts III and V (except for footnote 38) and the judgment; GLICKMAN, FISHER, and MCLEESE, *Associate Judges*, concur in the judgment; and BECKWITH

and EASTERLY, *Associate Judges*, join in parts III and IV, but dissent from the judgment.

Concurring and dissenting opinion by GLICKMAN, *Associate Judge*, with whom FISHER and MCLEESE, *Associate Judges*, join in full, and THOMPSON, *Associate Judge*, joins in Parts III and IV, at page 55.

Concurring and dissenting opinion by *Associate Judges* BECKWITH and EASTERLY, with whom WASHINGTON, *Chief Judge*, joins in Part I and II, at page 137.

WASHINGTON, *Chief Judge*:  A.H. and T.L., biological parents of minor children A.L. and Ta.L., along with the children's aunt, E.A., challenge the trial court's decision granting the adoption of A.L. and Ta.L. by their foster parents, R.W. and A.W. (the "W.s"), and denying E.A.'s adoption petition.  This court granted the petition by appellees R.W. and A.W. for rehearing en banc, thereby vacating its original opinion in this case, *In re Ta.L.*, 75 A.3d 122 (D.C. 2013), *vacated sub nom. In re R.W.*, 91 A.3d 1020 (D.C. 2014), in part because this appeal raises serious concerns about our prior decision in *In re K.M.T.*, 795 A.2d 688 (D.C. 2002), where a division of this court held that permanency goal decisions of the trial court are not appealable.[1]  Specifically, appellants A.H. and T.L. complain that the informal process used to change the permanency goal for their family from

---

[1]  795 A.2d at 690 ("In the context of neglect proceedings after the court has made an adjudication of neglect, finality has generally been held to mean either a restoration of physical custody, a termination of parental rights, or an adoption. An order that is merely a step toward one of those acts is therefore not final and appealable.").

reunification to adoption, a decision they could not challenge on appeal and one that ultimately resulted in a termination of their parental rights, violated their constitutional due process rights. In addition, appellants argue that the trial court erred in granting the W.s' adoption petition because, in considering the competing adoption petitions, the trial court failed to give weighty consideration to the adoption petition of the biological parents' preferred caregiver, E.A. We agree with appellants that when the Child and Family Services Agency, ("CFSA")—the agency charged with assisting parents in their efforts to reunite with their children that have been removed from their home—requests that the trial court change the goal for the family from reunification to adoption, the parents must have the right to contest the goal change before they are forced to make a Hobson's choice between contesting the adoption petition of a stranger or consenting to the adoption of their children by a family member. Additionally, the parents should be able to appeal such a change because it marks a point in time when the trial court has effectively authorized CFSA to transfer its support to someone else to parent the child. Despite our ruling here today, we affirm the trial court's decision to grant the adoption petition of the W.s because it is supported by clear and convincing evidence that at the time of the adoption hearing, the biological parents, T.L. and A.H., withheld their consent to the adoption against the best interest of the children

and there was clear and convincing evidence that adoption by E.A. was not in the best interests of the children.

## I. Facts

On March 24, 2008, A.L. and Ta.L. were removed from the care and custody of their biological parents, A.H. and T.L., following the arrest and incarceration of both parents for a domestic violence incident in the family's home. The CFSA immediately assumed custody of the children, and placed them in foster care with R.W. and A.W. A.L. was sixteen months old and Ta.L. was three months old at the time. The children were both underweight. A.L. was not current on her immunizations and suffered from significant medical problems, including sleep apnea and chronic pulmonary issues as well as an eye disorder and acid reflux. Ta.L. was diagnosed with failure to thrive syndrome and had not seen a doctor since birth. A.L.'s pediatrician later testified that she was concerned that A.L. might not regularly be receiving the proper treatment required for her ailments, which could be life-threatening without treatment.

Two days after the children's removal from their biological parents' care, CFSA conducted a Family Team Meeting[2] to identify family members who might provide a temporary placement for the children while A.H. and T.L. worked toward reunification. Two of T.L.'s sisters, K.A.-R. and E.A., attended the meeting. K.A.-R. indicated that she would be willing to become a kinship foster care provider for the children, and E.A. agreed to be a backup provider for K.A.-R. E.A. testified that it was her understanding that if K.A.-R.'s foster care license was denied, she would be second in line to get the children as a kinship foster care provider; however, E.A. did not take any steps to become a kinship foster parent at that time.

Approximately two weeks later, K.A.-R. learned that her husband did not pass the requisite background check and, as a result, she could not be licensed to care for the children in her home. K.A.-R. told E.A. that she was unable to complete the licensing process, but reassured E.A. that the children's permanency

_____

[2] Family Team Meetings are "family group decision-making meetings for children in the child welfare system[] that enable families to make decisions and develop plans that nurture children and protect them from abuse and neglect." 42 U.S.C. § 627 (a)(3)(A) (2010); D.C. Code § 16-2312 (a-1)(1) (2012 Repl.) (Family Team Meetings in the District "solicit the input of family members, relatives, and others concerned with the welfare of the child to develop a safety plan approved by the Agency.").

goal was reunification, which T.L. confirmed to E.A. a short time later. E.A. testified that because she understood the children's permanency goal to be reunification, she did nothing to attempt to become a placement for the children. CFSA also did not make any attempts to contact E.A. and qualify her as a kinship placement.

A.L. and Ta.L. were adjudicated neglected children on May 1, 2008, because they lacked proper parental care and control and because T.L. and A.H. were unable to discharge their parental responsibilities due to their incarceration and substance abuse problems.[3] The trial court committed the children to CFSA's custody and care, with a permanency goal of reunification with the biological parents to be achieved by May 2009.

On May 14, 2009, the trial court held a permanency hearing during which the government moved to change the permanency goal from reunification to adoption because the biological parents had not made sufficient progress towards reunification. The trial court approved the change in permanency goal from

_____

[3] D.C. Code § 16-2301 (9)(A)(ii)–(iii) (2012 Repl.).

reunification to adoption, finding that T.L. and A.H. had not: 1) complied with the trial court's order for drug testing or participated in drug treatment; 2) regularly attended couples' counseling; 3) consistently visited the children; 4) secured stable housing; and 5) been involved with the children's medical care and educational services.

Less than a month later, on June 12, 2009, R.W. and A.W., who had been caring for Ta.L. and A.L. since March 2008, filed a petition to adopt Ta.L. and A.L. Shortly thereafter, E.A. was contacted by a social worker because T.L. mentioned E.A. as a placement option for the children during the May 14, 2009, change of permanency goal hearing.[4] E.A. began visiting the children in June or July 2009. Visits were moved to E.A.'s home in August 2009 where the children would visit with E.A. and their biological parents for one to two hours per week. E.A. testified that she requested more visits with the children, but her requests were denied.

_____

[4] E.A. was also previously identified as a potential kinship care provider at the Family Team Meeting in March 2008.

On October 9, 2009, four months after the first adoption petition was filed, E.A. filed a petition to adopt A.L. and Ta.L. At a review hearing held on November 6, 2009, A.H. and T.L. indicated they would consent to E.A.'s adoption petition because it was in the best interest of the children to be adopted by E.A. rather than be returned to their own care. E.A. began taking foster care classes in November 2009 and became a licensed therapeutic foster care provider in December 2009. An adoption social worker deemed E.A.'s home appropriate for children. CFSA, however, supported R.W. and A.W.'s petition, citing the foster parents' ability to provide a stable home and meet all of the children's daily and medical needs, the children's strong bond with the W.s, E.A.'s limited involvement in the lives of the children, and concern for the safety of the children while in E.A.'s care in terms of her ability to protect the children when their biological parents are around.

The adoption trial was held in May 2011.[5] At the time of the adoption trial, the children had been in R.W. and A.W.'s care for three uninterrupted years. A.H. and T.L. explained to the court that they consented to adoption by E.A. because

_____

[5] No effort was made to terminate A.H. and T.L.'s parental rights before this time, which would have provided the biological parents with an appealable order prior to adoption.

they wanted A.L. and Ta.L. to remain in their family. At trial, E.A. claimed that CFSA had a duty to contact her so that she could become a kinship care provider, and that she would have had a stronger bond with the children had she been timely informed. The W.s argued that it was in the children's best interest to be adopted by their foster family. Three experts also offered testimony during the adoption proceeding: Dr. James Venza, who conducted an attachment study between the children and the W.s; Dr. Sheryl Frank, who conducted a court-ordered bonding study of all the parties; and Dr. Charles David Missar, who offered a critique of the aforementioned studies on behalf of A.H., T.L., and E.A.

The W.s called psychologist Dr. Venza as an expert witness. Dr. Venza conducted a study of the attachment between the W.s and the children in March 2010, when A.L. was three and Ta.L. was two. The children had been with the W.s for two years at that point, and had been visiting E.A. weekly for approximately a year. Dr. Venza concluded that A.L. had a secure attachment to A.W., which is the optimal level of development, and that Ta.L. had an anxious avoidant attachment to A.W., due in part to his age.[6] Dr. Venza noted substantial

_____

[6] In his amicus brief, Dr. Robert Marvin explains that a secure attachment "is the [healthiest and] most trusting pattern of attachment, in which a child sees

(. . . continued)

growth in the children's cognitive abilities while in the W.s' care and predicted the children would regress cognitively if separated from the W.s. Dr. Venza concluded that the impact of removing the children from the W.s' care would be potentially "devastating" to their long-term development, particularly given their early history of neglect, medical challenges, and developmental delays, and that the risk of permanent or irreparable harm was "clear" and "unmistakable." Dr. Venza also concluded that the impact of the children's separation from the W.s would not differ based on where they were subsequently placed. Dr. Venza did not, however, study A.L. and Ta.L.'s attachment to E.A.

Dr. Frank, a consulting psychologist with the Department of Mental Health's Assessment Center and court-appointed neutral expert, also testified about a court-ordered bonding study she performed in July 2010 between the children, the biological parents, and all the petitioners. Dr. Frank largely echoed Dr. Venza's testimony. Dr. Frank testified that the children's relationship with their biological

---

(….continued)

the attachment figure as *both* a secure base *and* a safe haven." An anxious-avoidant attachment, the next-healthiest type of attachment, "represents a relationship in which a child is strongly attached to the caregiver. However, the child may anxiously avoid some of the more-intimate types of parent-child interactions that are typical of children with secure attachments."

family was positive and that E.A. ably directed the children's play, set appropriate limits, had a nice manner with the children, and was attuned to their needs. However, Dr. Frank concluded that A.L. and Ta.L. were "most attached" to the W.s and would suffer the greatest harm, in both the short- and long-term, if that bond were broken, and that the children's "emotional and behavioral development" were at a "high risk of derailment." Accordingly, Dr. Frank agreed with Dr. Venza's assessment and recommended that the court grant the W.s' petition.

E.A. called clinical psychologist Dr. Missar as her expert witness to offer a critique of Dr. Venza's and Dr. Frank's assessments. Although he generally agreed with their opinions, Dr. Missar opined that Dr. Frank was not in a position to offer an opinion about the children's attachment to any party because she had only conducted an assessment of their bonding. As for Dr. Venza's evaluation, Dr. Missar found the primary limitation to be that he did not assess the children's attachment to their biological family, including E.A. However, Dr. Missar agreed with Dr. Venza's testimony concerning the importance of attachments in child development and agreed that "severing a child's strong primary attachment to a caretaker poses significant risks of short- and long-term harm to the child—risks that are more severe than the loss of a sense of family identity occasionally

experienced by an adopted child." Dr. Missar testified that these short-term risks include "behavioral regression," "signs of withdrawal, signs of anxiety, [and] signs of depression," while long-term risks include "a lack of trust in others . . . as well as some on-going problems with depression and anxiety."

On August 31, 2011, the trial court granted R.W. and A.W.'s adoption petition over E.A.'s adoption petition. The trial court stated that it gave "weighty consideration" to the biological parents' preference for E.A. to adopt A.L. and Ta.L., but that evidence presented at trial clearly established that the children's primary attachments were to the W.s, not E.A. The trial court concluded that given the limited time the children had spent with E.A. and their birth parents in the past three years, it was "inconceivable that the children [had] meaningful attachments to any of them." On the basis of the three experts' testimony—which the trial court regarded as "very persuasive"—the trial court found that a disruption of the attachments would pose a significant risk that all or most of the progress of the past three-plus years would be lost and that the children would regress to their pre-removal developmental trajectories. Although the trial court found E.A. to be a "forceful, healthy, and competent person" and stated that it "[did] not doubt her fitness as a caretaker for Ta.L. and A.L.," the trial court found the risk to the

children's progress too great if the continuity of care provided by the W.s and the children's attachment to the W.s was not maintained. In its analysis, the trial court assessed the relevant statutory termination of parental rights factors set out in D.C. Code § 16-2353 (b) and concluded that A.H. and T.L. were withholding their consent to adoption by the W.s contrary to the children's best interests and that placement of the children with E.A. was not in the children's best interests.

## II. Legal Standards

The Supreme Court has long recognized the fundamental right of parents to raise their children.[7] Even when parents have not been "model parents" or the state has temporary custody of their child, parents retain their "fundamental liberty interest . . . in the care, custody, and management of their child" and have a "critical need for procedural protections[.]"[8] This court has held that because the Constitution protects a biological parent's liberty interest in preserving a

_____

[7] *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (acknowledging the "[Supreme] Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest"); *Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925).

[8] *Santosky*, 455 U.S. at 753.

relationship with his or her child, any "state intervention [into that] relationship is subject to constitutional oversight." *In re T.J.*, 666 A.2d 1, 12 (D.C. 1995) (citing *In re Baby Boy C.*, 630 A.2d 670, 673 (D.C. 1993)). The state "must provide the parents with fundamentally fair procedures."[9]

"Absent termination of parental rights or some other finding that the parents should no longer be permitted to influence the child's future, the parents' rights necessarily include the right to consent, or withhold consent, to the child's adoption." *In re T.J.*, 666 A.2d at 12. However, under our current adoption statute, a court may grant a petition for adoption without the consent of the natural parent if it finds by clear and convincing evidence that the consent is being withheld contrary to the best interest of the child. *See* D.C. Code § 16-304 (e) (2012 Repl.). Because granting an adoption without the natural parent's consent necessarily terminates the parent's rights, the court must weigh the same statutory factors listed in D.C. Code § 16-2353 (b) that are considered in a termination of parental rights ("TPR") proceeding[10] to decide whether termination is in the child's best interest. *See In re S.L.G.*, 110 A.3d 1275, 1285 (D.C. 2015).

---

[9] *Santosky*, 455 U.S. at 754.

[10] The factors, among those relevant to the present circumstances, are:

(. . . continued)

Where there are competing adoption petitions and the biological parents have consented to adoption by one of the petitioners, "before rejecting the designated custodian's petition and severing the child's relation with his parent . . . and other relatives . . . the trial court must find by clear and convincing evidence both that the custody arrangement chosen by the [parents] would clearly not be in the best interest of the child and that the parent[s'] consent to adoption is withheld contrary to the child's best interest." *In re T.J.*, 666 A.2d at 11 (citing *In re J.S.R.*,

_____

(….continued)

> (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
>
> (2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
>
> (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; . . .

D.C. Code § 16-2353 (b) (2012 Repl.). Other factors set out in the statute, not at issue in the present case, are whether the child was abandoned at the hospital following his or her birth; the child's opinion of his or her own best interests in the matter; and evidence of ongoing drug-related activity in the child's home environment. *See id.* § 16-2353 (b)(3A), (b)(4), (b)(5).

374 A.2d 860, 864 (D.C. 1977)).  Thus, the clear and convincing evidence standard applies both when determining whether the parents' consent to adoption can be waived under § 16-304, and when considering whether granting custody to the parent's preferred caregiver is contrary to the best interest of the child.  *See In re C.A.B.*, 4 A.3d 890, 901 (D.C. 2010).

"We review the trial court's order granting an adoption for abuse of discretion, and determine whether the trial court 'exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factors.'"  *In re T.W.M.*, 964 A.2d 595, 601 (D.C. 2009) (quoting *In re T.J.*, 666 A.2d at 10).  We then assess whether the trial court applied the correct standard of proof, and "evaluate whether the [trial court's] decision is supported by 'substantial' reasoning, . . . 'drawn from a firm factual foundation' in the record."  *In re D.I.S.*, 494 A.2d 1316, 1323 (D.C. 1985) (quoting *In re R.M.G.*, 454 A.2d 776, 790 (D.C. 1982)).

### III.  Appellate Review of Permanency Goal Changes From Reunification to Adoption

Before we turn to the merits of this appeal, we must first address whether the constitutional rights of biological parents to raise their children are effectively protected under the statutory scheme currently utilized in neglect cases, and whether our decision to preclude review of permanency goal changes in *In re K.M.T.* undermines those rights.  Our dissenting colleagues disagree with our decision to address the appealability of decisions which change the permanency goal in neglect cases from reunification to adoption in this appeal.  *Post* at 62-63.  They contend that the issue is not properly before us because the natural parents failed to preserve the issue in the trial court.  While we agree that this issue was not raised below we believe that the issue is ripe for consideration.  *In re K.M.T.* effectively precluded a timely challenge to the permanency goal change and, therefore, no party will be unfairly prejudiced by our review.  We have repeatedly affirmed our discretion, in the interests of justice, to consider an argument that is raised for the first time on appeal if the issue is purely one of law, . . . the factual record is complete, and a remand for further factual development would serve no purpose.  *See Pajic v. Foote Prop., LLC*, 72 A.3d 140, 145-46 (D.C. 2013) (quoting *District of Columbia v. Helen Dwight Reid Educ. Found.*, 766 A.2d 28, 33

n.3 (D.C. 2001).[11]  Thus, we are satisfied that addressing this issue at this time is not inconsistent with our case law that provides a narrow exception to our general error preservation rule because the question before us is purely one of law and no further factual record is necessary.

In seeking to protect the rights of biological parents to raise their children, give full weight to the District of Columbia's policy preference that children be placed with family members,[12] ensure that all decisions are guided by the best interest of the children over whom this court exercises *parens patriae* authority, and move the children to permanency within timeframes set forth in the Adoption

---

[11]  This court only applies the exception for reviewing unpreserved issues under *Pajic* and *Helen Dwight Reid* to civil cases; the exception does not extend to criminal cases, where we apply the more rigorous plain error test under *Puckett v. United States*, 556 U.S. 129 (2009) and *United States v. Olano*, 507 U.S. 725 (1993). *See, e.g.*, *Fortune v. United States*, 59 A.3d 949, 954-55 (D.C. 2013) (finding plain error under *Olano* where the trial court failed to obtain a valid waiver of appellant's jury trial right in a criminal case); *In re Robertson*, 19 A.3d 751, 760 (D.C. 2009) (applying the test from *Puckett* and *Olano* in a criminal contempt case); *Otts v. United States*, 952 A.2d 156, 161-62 (D.C. 2008) (applying the plain error test under *Olano* in a criminal, unlawful-drug-possession case).

[12]  *See* 42 U.S.C. § 671 (a)(19) (2012); *see also* 62 Fed. Reg. 36610, 36617 (July 8, 1997).

and Safe Families Act ("ASFA"),[13] we have endorsed a process that appellants here, as well as several amici, contend significantly undermines the constitutional rights of parents to raise their children as well as their ability to effectively challenge a trial court's determination that they were not making sufficient progress towards reunification to warrant CFSA's continued efforts to achieve that goal. In fact, appellants, A.H. and T.L., as well as several amici,[14] argue that our efforts to balance the respective rights of the biological parents, the children, and the prospective adoptive parents have led the court to endorse a process that actually denies the biological parents their due process rights and undermines any meaningful opportunity they may have had to challenge permanency goal change decisions that often preordain the termination of the parent-child relationship. They argue that we must first require the government to meet its burden of proving, by a preponderance of the evidence, that reasonable efforts were made to assist the parents in achieving reunification with their children, that reunification

---

[13] Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115, 2128 (1997) (amending section 475 (5)(c) of the Social Security Act, codified as amended at 42 U.S.C. § 675 (5)(c) (Supp. 1999)).

[14] Legal Aid Society of the District of Columbia, National Association of Counsel for Children, Center for Family Representation, Inc., Family Defense Center, and Family Law Professors Vivek S. Sankaran, Christine Gottlieb, and Martin Guggenheim.

efforts failed despite the agency's reasonable efforts, and that changing the goal from reunification to adoption is in the best interest of the children.

Specifically, appellants A.H. and T.L., as well as the amici, contend that when a trial court changes the goal of a neglect proceeding from reunification to adoption, it informally terminates the pending neglect case and effectively puts the case on an almost unalterable path to adoption without a full evidentiary hearing or recourse to an appeal. This contention is not without support in the record of this case and many others. In fact, it only makes sense that when a child's permanency goal is shifted from reunification to adoption, government resources and services are also shifted away from facilitating reunification, and instead, focus on finding and supporting potential new and permanent placements for the child.[15]

While it is ostensibly possible for the biological parents to attain reunification notwithstanding a decision by the trial court to grant a permanency

_____

[15] 42 U.S.C. § 671 (a)(15)(C) (if reasonable efforts are inconsistent with the permanency plan for the child, that is, the goal has been changed to adoption rather than reunification, reasonable efforts "shall be made to place the child in a timely manner in accordance with the permanency plan"); D.C. Code § 4-1301.09a (c) (2012 Repl.).

goal change, this very rarely occurs in practice. *See, e.g.*, *In re G.A.P.*, 133 A.3d 994 (D.C. 2016); *In re W.D.*, 988 A.2d 456, 458-59 (D.C. 2010) (goal change from reunification to adoption led to grant of foster parent adoption); *In re F.W.*, 870 A.2d 82, 87-88 (D.C. 2005) (affirming trial court's decision to grant petition for adoption). More often, the parents' efforts to build or maintain a positive relationship with their child is severely hampered by the trial court's permanency decision and by the time a parent is given the ability to challenge that decision, the passage of time and the child's resulting attachment to the custodial adoption petitioner tends to make the granting of the adoption petition and the consequent termination of parental rights a *fait accompli*. *See, e.g.*, *In re R.E.S.*, 19 A.3d 785, 791 (D.C. 2011); *In re An.C.*, 722 A.2d 36, 40 (D.C. 1998); *In re D.R.M.*, 570 A.2d 796, 806 (D.C. 1990).

It is quite possible that this court's distaste for terminating parental rights without a viable alternative permanent living situation for the children is what led us to endorse this TPR by adoption practice in the first instance. However, we now recognize that the parents' right to timely challenge the effective severing of their relationships with their children is too important a right to sacrifice to achieve some marginally greater efficiency in moving children to permanency. In sum, we

hold that a trial court's grant of a permanency goal change from reunification to adoption over the parents' objection, without an adjudicatory hearing to determine whether the District has fulfilled its duty to expend reasonable efforts to reunify the family, violates a parent's procedural due process rights and, therefore, is appealable by the parents as a matter of right.

The District of Columbia is among the few remaining jurisdictions that do not permit appeals of permanency goal changes from reunification to adoption in neglect proceedings. Indeed, a vast majority of jurisdictions allow appellate review of goal changes either as appeals as of right or interlocutory appeals.[16] In *In re K.M.T.*, this court departed from the norm in our sister jurisdictions, holding

_____

[16] Sixteen states allow parents to immediately appeal permanency goal changes as of right (Alabama, Connecticut, Florida, Georgia, Louisiana, Maryland, Massachusetts, Montana, Nebraska, Oklahoma, Oregon, Pennsylvania, South Carolina, Vermont, Virginia, and Wyoming). Twenty-six states allow for interlocutory review of permanency goal changes, either at the discretion of the appellate court or by certification of the family court (Alaska, Arkansas, Colorado, California, Delaware, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Michigan, Minnesota, Mississippi, New Hampshire, New Jersey, New Mexico, New York, North Dakota, South Dakota, Tennessee, Washington, West Virginia, and Wisconsin). *See also* Md. Code, Courts & Jud. Proc. Art. § 12-303 (3)(x); *In re Damon*, 765 A.2d 624, 628-29 (Md. 2001) ("[A]n order amending a permanency plan calling for reunification to foster care or adoption is immediately appealable.").

that permanency goal changes are not among the orders and judgments with the "finality" necessary to warrant the right of appeal. *In re K.M.T.*, 795 A.2d at 690.

This court has jurisdiction over all "final orders and judgments" of the Superior Court. D.C. Code § 11-721 (a)(1) (2012 Repl.). An order is not usually final unless it completely resolves the case on its merits;[17] but, to be final, an order need not necessarily be the last one in a proceeding. *See District of Columbia v. Tschudin*, 390 A.2d 986, 988 n.1 (D.C. 1978). In the context of neglect proceedings, we have held that orders modifying visitation, and restoring physical custody, are "final orders" for purposes of appealability; however, we have held that a change of permanency goal is merely a step towards the termination of parental rights or an adoption and is not final, and thus not appealable. *See In re K.M.T.*, 795 A.2d at 690 (citing *In re D.M.*, 771 A.2d 360, 365 (D.C. 2001)).

In holding that a permanency goal change is not appealable, this court in *In re K.M.T.* reasoned that such an order "merely sets goals for the children," and therefore, "does not affect the parents' substantive rights in any way." *Id.* at 690-

_____

[17] *See In re C.A.B.*, 4 A.3d at 897 (citing *In re K.M.T.*, 795 A.2d at 688).

91. At least with respect to goal changes from reunification to adoption, we now disagree. The decision to change the goal for a child from reunification to adoption is more than just a step in the neglect process. It is a critical point in the proceedings, one that often irreversibly dictates the result of a child's ultimate custody disposition at a subsequent adoption proceeding. Such an order is at least as critical a change in a neglect proceeding as an order modifying visitation or restoring physical custody to one parent, for which we already recognize the right of a parent to appeal. Given that a goal change to adoption cannot be appealed under our current neglect process and, recognizing that the decision has the potential to strongly influence the outcome of a subsequent adoption proceeding, we are now of the opinion that a trial court's decision to change the goal from reunification to adoption must be appealable to adequately protect the constitutional rights of parents involved in neglect proceedings. Therefore, we overrule our prior decision, *In re K.M.T.*, and hold that a change in the permanency goal of a neglect case from reunification to adoption is an order subject to immediate appellate review.[18]

_____
[18] An order changing the permanency goal from reunification to adoption, which as we have said is effectively a final order as it is unlikely that it will be changed back to reunification, cannot be compared, as the dissent attempts, to an order removing a child and placing him or her in shelter care, *see In re S.J.*, 632 A.2d 112 (D.C. 1993), or to an order suspending visitation until a parent's criminal

(. . . continued)

We do not overrule *In re K.M.T.* lightly and recognize that such a decision will have a significant impact on the process currently used by trial courts in making permanency goal decisions. Because trial court decisions that change goals from reunification to adoption will now be appealable, the permanency goal hearing must be conducted in a way that affords parents their due process rights. Our review of the record here, as in many other neglect cases, indicates that trial courts are routinely presented with information contained in the government's permanency report without any testimony from those who provided the information on which that the government's recommendations are based or any other evidence that undergirds the findings and/or conclusions found in those reports. While a report of this kind may be sufficient for a typical neglect review hearing, it does not pass due process muster when the rights at stake are as great as a parent's constitutional right to raise his or her child.

---

(….continued)

charges are resolved, *see In re M.F.*, 55 A.3d 373 (D.C. 2012), which are both temporary situations limited in time.

It is also important to recognize that permanency goal hearings are required by ASFA. Concerned that too many children were languishing in foster care, Congress sought to increase the number of adoptions so children could be moved more quickly into permanent homes.[19] However, in so doing, Congress recognized the need to strike a balance between pursuing this goal and preserving the right of families to remain intact. In fact, as a condition for obtaining federal funds to support their foster care programs, ASFA requires participating states to expend reasonable efforts to "preserve and reunify" families "to make it possible for a child to safely return to the child's home." 42 U.S.C. § 671 (15)(B)(ii) (2012); *see also* D.C. Code § 4-1301.09a (b) (2012 Repl.). In this vein, the Act requires that within a child's first twelve months in foster care, and at least every six months thereafter, state courts must hold a permanency hearing. 42 U.S.C. § 675 (5)(B), (C) (2012); *see also* D.C. Code § 16-2323 (a)(4) (2012 Repl.). At these periodic review points, courts must consider whether the child can be returned to the parent, 42 U.S.C. § 675 (5)(C), and must assess whether the state has expended reasonable efforts to achieve reunification and whether those efforts should continue, 42 U.S.C. § 671 (15)(C); *see also* D.C. Code § 4-1301.09a (c); D.C. Super. Ct.

_____

[19] H.R. Rep. No. 105-77, pt. 1, at 8 (1997) ("There seems to be almost universal agreement that adoption is preferable to [indefinite] foster care and that the nation's children would be well served by a policy that increases adoption rates.").

Neglect Rule 34 (c).[20]  However, ASFA also establishes a time frame within which parents have to ameliorate the conditions that led to the finding of neglect or face the prospect of having their parental rights terminated.  Under ASFA, if a child has been in foster care for fifteen out of the preceding twenty-two months, the state is required to seek termination of the parents' rights unless certain exceptions apply.  42 U.S.C. § 675 (5)(E) (2012).  One of these exceptions is a safety valve to protect families who have not received sufficient assistance from the state:  termination need not be sought if "the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the child to the child's home, if reasonable efforts of the type described in section 671(a)(15)(B)(ii) of this title are required to be made with respect to the child."  *Id.*[21]

_____

[20]  In the District, CFSA is required "[a]t least 10 days prior to each review or permanency hearing . . . to submit a report . . . which shall include," *inter alia*, "[t]he services provided or offered to the child and his parent, guardian, or other custodian."  D.C. Code § 16-2323 (d).

[21]  Termination also need not be sought if "the child is being cared for by a relative."  42 U.S.C. § 675 (5)(E).  A third exception to a forced goal change allows the state to avoid the obligation of filing a termination petition if the "State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child."  *Id*.

Similarly, under our neglect statute, when a child has been adjudicated neglected and remains in an out-of-home placement, a review hearing must be held every six months unless a permanency hearing was held during the preceding six months. D.C. Code § 16-2323 (a)(1). Review hearings are conducted by the court to determine whether the child is safe, and whether appropriate steps are being taken to address the needs of the child and to ameliorate the problems that led to the child being brought into the system. *See id.* § 16-2323 (b)(1)-(5). A permanency hearing not only concerns itself with the issues typically addressed at a review hearing but also requires the court to determine the permanency plan for the child, including whether, and if so when, the child will be returned to the parent(s), placed pursuant to an award of legal custody or guardianship, placed in another permanent living situation, or placed for adoption. *See id.* § 16-2323 (c)(2). Section 16-2323 (d) of the neglect statute sets out the obligations of the government preceding a permanency hearing in which the government recommends a goal change. *See* D.C. Code § 16-2323 (d). Under this provision, the government is required to submit a report to the court and the parties that addresses the services offered to the child and the parents; any evidence that the issues that led to the neglect disposition have been ameliorated or have worsened;

and when, if at all, the child can be returned to the parent's home.[22]  Given the

importance of the permanency hearing, we conclude that unless the parents are

_____

[22]  Section 16-2323 (d) provides, in full:

> (d) At least 10 days prior to each review or permanency hearing the Division or the department, agency, or institution responsible for the supervision of the services to the child and his parent, guardian, or custodian shall submit a report to the Division which shall include, but not be limited to, the following information:
>
> > (1) The services provided or offered to the child and his parent, guardian, or other custodian;
> >
> > (2) Any evidence of the amelioration of the condition which resulted in the finding of neglect and any evidence of new problems which would adversely affect the child;
> >
> > (3) An evaluation of the cooperation of the parent, guardian, or custodian with the Division or the applicable department, agency, or institution;
> >
> > (4) In those cases in which the custody of the child has been vested in a department, agency institution, or person other than the parent:
> >
> > > (A) The extent to which visitation has occurred and any reasons why visitation has not occurred or has been infrequent;
> > >
> > > (B) The estimated time in which the child can be returned to the home; and

(. . . continued)

prepared to stipulate that reasonable efforts were made by the government to help the parents ameliorate the problems that led to the Neglect adjudication, due process requires a more formal hearing than has been afforded to parents in the past when no such right of appeal existed. At such a hearing, the government must produce sufficient evidence from which a trial court can find by a preponderance of the evidence that the presumption in favor of reunification has been rebutted before the goal can be changed from reunification to adoption. In other words, the government must prove by a preponderance of the evidence that it has provided the parents with a reasonable plan for achieving reunification, that it expended reasonable efforts to help the parents ameliorate the conditions that led to the child being adjudicated neglected, and that the parents have failed to make adequate progress towards satisfying the requirements of that plan. If the government

---

(….continued)

(C) Whether the agency has initiated or intends to initiate the filing by the Corporation Counsel of a motion requesting the termination of the parent and child relationship and any reasons why it does not intend to;

(5) Any other information as may be required by the rules of the Superior Court of the District of Columbia.

satisfies its burden, a change of permanency goal from reunification to adoption would be presumptively consistent with the requirement that we act in the best interest of the child.

Given AFSA's delicate balancing of interests, it only makes sense that the primary focus of the permanency planning hearing should be on the parents' efforts to ameliorate the conditions that led to the neglect and the District's efforts to assist them in achieving those goals. Acting on a determination of past neglect, the District maintains custody of this child with the understanding that such custody is temporary and that it will expend all reasonable efforts to help the troubled family and to reunify the child with her parents.[23] However, once it is determined that the goal should be changed to adoption, the District is obligated to put forth its best effort to make that goal a reality.[24] To put a finer point on it, such

_____

[23] Pursuant to ASFA, the presumptive goal is reunification, and states have an obligation to expend "reasonable efforts" to help families reunify. *See* 42 U.S.C. § 671 (a)(15)(B)(ii); H.R. Rep. No. 105-77, pt. 2, at 12 (1997). ("[T]ermination of parental rights is such a serious intervention that it should not be undertaken without some effort to offer services to the family."); *see also* D.C. Code § 4-1301.09a (b); 45 C.F.R. 1356.21 (b)(2) (2001).

[24] Once a goal change from reunification to adoption has been endorsed, the state assumes the obligation to expend reasonable efforts to achieve *that* goal. *See* 42 U.S.C. § 671 (a)(15)(C); D.C. Code § 4-1301.09a (c).

goal change orders modify the fundamental terms of the custody order in the neglect proceeding and mark a critical point in time when the role of CFSA changes from a supporter of family reunification to an advocate for breaking up that same family. And, even though we recognize that nothing in the statute prohibits a court from establishing concurrent goals of reunification and adoption, the presumption in favor of reunification remains the primary goal of neglect proceedings with adoption as a favored alternative placement for children when efforts to reunify the family fail. Thus, a permanency goal decision that might lead to a situation that destroys family bonds must not be given short shrift when it comes to protecting the rights of parents to raise their own children. [25]

To ensure that the government has made reasonable efforts to reunify the family, parents must have an opportunity to challenge any statements, observations, and evaluations that form the basis of CFSA's recommendation to the court to change the permanency goal. An appropriate hearing will provide a

_____

[25] It is immaterial that a permanency goal of adoption can theoretically be changed back to reunification. When a court orders a new permanency goal, this goal, as its name indicates, is intended to set out the District's final plan for a child's permanent placement. As such, it is akin to an indefinite visitation order, which we have held to be appealable because it is final unless and until it is changed. *In re D.M.*, 771 A.2d at 365.

forum where the parents can testify, under oath concerning any alleged failure on the District's part to provide the requisite services and resources as well as their own efforts to meet the goals set forth in the plan that was developed to promote reunification. The hearing will also enable parents to present any other evidence that they believe supports a decision to continue with reunification efforts. Based on the evidence presented at the hearing, the trial court will be able to make findings of fact and conclusions of law that will allow this court to conduct a meaningful review of the trial court's permanency decision and determine "whether the trial court 'exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor.'" *In re D.S.*, 88 A.3d 678, 691 n.21 (D.C. 2012) (quoting *In re Baby Boy C.*, 630 A.2d at 673).

More specifically, before approving a permanency goal change that allows the District to divert its limited resources from reunification to adoption, the trial court (absent waiver by the parent) must ensure that a goal change is the appropriate course of action by, at a minimum, making findings that: (1) the District has in fact expended reasonable efforts to reunify the family as it is statutorily obligated to do, in accordance with 42 U.S.C. § 675 (5)(E)(iii); (2) the goals set for the parents were appropriate and reasonable; and (3) other vehicles for

avoiding the pursuit of termination, e.g., kinship placements, 42 U.S.C. § 675 (5)(E)(i), have been adequately explored.[26] This court will review on appeal whether the trial court has made the requisite findings to justify a goal change and whether those findings were adequately supported by the record.[27]

_____

[26] In the District, placement with relatives is recognized as a preferred alternative to placement with foster parents. In this case, the District's failure to follow up with E.A. at the beginning of the case led to the issue of kinship placement being unresolved at the time of the permanency goal change. We agree with the dissent that pursuant to D.C. Code § 16-2323 (c)(4) (2012 Repl.), a permanency hearing, generally, is not the appropriate time to consider kinship placements; however, that assumes other options were explored at the beginning of the removal process as required by law. *See also, e.g.*, 29 DCMR § 6028.2 (k) (referring to the District's "hierarchy of permanency plan options," in the order of "[r]eturn home to parents" and "placement with relatives"); 29 DCMR § 1642.1 ("The first priority of the foster care system shall be to maintain a child in his or her home or that of a relative."); 42 U.S.C. § 671 (a)(19); CFSA, Permanency Planning Policy 9-11 (May 25, 2011), available at http://cfsa.dc.gov/DC/CFSA/Publication%20Files/Policy%20Manual/Policies/Prog ram%20- %20Permanency%20Planning%20(final)(H).pdf (CFSA's policy that "[w]hen reunification is not in a child's best interest, adoption by kin shall be considered as a permanency goal" and "[a]doption by non-kin is an alternative permanency option when permanency with kin not in the child's best interests.").

[27] During the permanency proceeding in this case, the magistrate judge seemed more intent on resolving the goal change issue "right quick" than in making the requisite findings to support it. It is possible that the magistrate judge was prepared to rule based on information gleaned during some of the prior review hearings and was thus deciding this matter on the basis of information that is not evident in the record of this appeal. However, there appears to be a dispute of fact regarding the accuracy of the visitation records in this case, which the magistrate

(. . . continued)

Adversarial litigation of these issues followed by appellate review is further compelled where the District's shift in support and allegiance can harm the constitutionally protected parent-child relationship, if not preordain its ultimate termination. The services and support the District provides to fragile families in the neglect system are essential to achieving their reunification goals. Presumably, the District's intervention would not have been necessary had the parents not been facing serious challenges and lacking robust support systems; the removal of a child from her parent's home may be an additional destabilizing force. Courts may restrict visitation, lessen parental involvement in the child's life, and even order information about the child to be withheld from the parents. D.C. Super. Ct. Neg. R. 34 (g)(6). These changes can devastate parent-child relationships.[28] Time is of

---

(….continued)
judge does not seem to have recognized was her obligation to resolve, observing "[n]othing's been done that proves either way . . . so the goal is changed." She also appears to not have questioned the District about its efforts, if any, to assist the children's father with visitation after he apparently reported that he was unable to make his scheduled visitation because he was out of work and had lost his housing.

[28] This is so even if the permanency goal change is only to make adoption a concurrent goal with reunification. Familial relationships may be undermined when the District shifts from total support for the parent-child relationship and throws even partial support behind a competing parental candidate.

the essence, and if the District's support for reunification was improperly withdrawn, it must be restored as soon as possible.[29]

We are well aware that this decision places an additional burden on the Superior Court and, while we are confident that these permanency goal hearings can be conducted efficiently, we recognize that associate judge review of the magistrate judge order may result in some delay in moving children who have been adjudicated as neglected into permanent living situations. We are equally mindful of the potential additional delay that may occur if parents avail themselves of the right to appeal permanency goal decisions. Because of the limited scope of this court's review, and the broad discretion enjoyed by trial courts in making permanency goal decisions, we are confident that in the vast majority of cases our review can be adequately addressed using our summary appeals process. To that end, parties involved in an appeal from a decision by the trial court to change a

---

[29] Subsequent review at the termination stage is too late. But in any event this court's prior decisions make clear that the District's shortcomings in expending reasonable efforts to achieve reunification of the natural family are not a proper consideration at termination proceedings. This precedent essentially treats as harmless any failure by the District to meet its obligations under ASFA. Our conception of permanency hearings addresses this deficiency by squarely focusing the trial court's attention (and, on appeal, this court's attention) on the adequacy of the District's efforts to reunify the family.

permanency goal from reunification to adoption are encouraged to file cross-motions for summary disposition within the time frames provided for in Rule 4 (c) of the Rules of the Court of Appeals relating to appeals from Family Court cases. In the event that this court is unable to resolve the appeal through the summary disposition process, the appeal still will be expedited consistent with our existing rules.

## IV. Unfitness Requirement and the Termination of Parental Rights

In this case, neither the parents nor E.A. challenged the adoption on the basis that the trial court failed to first find that the parents, themselves, were unfit to raise their children. However, we take this opportunity to remind our colleagues on the trial court that the presumption in favor of a fit parent's right to raise his or her children must be rebutted by a finding of parental unfitness before the trial court can make the ultimate determination to terminate a biological parent's rights to raise his or her children.[30] The Supreme Court has recognized that the fundamental right of an individual to parent his or her child, *see Stanley*, 405 U.S.

_____

[30] Substantive due process requires "a presumption that fit parents act in the best interests of their children," *Troxel v. Granville*, 530 U.S. 57, 68 (2000), and recognition that the state may not "inject itself into the private realm of the family" absent a finding of unfitness. *Id.* at 68-69.

at 651,[31] may not be terminated without a predicate determination, by clear and convincing evidence that the individual is unfit to parent.[32] Thus, while we have recognized the "best interest of the child" as the decisive factor in determining whether to ultimately terminate parental rights in a neglect proceeding, it is critical that the trial court make a parental unfitness determination before undertaking a "best interests of the child" analysis.[33] Here, the trial court failed to make a

_____

[31] *See also Lehr v. Robinson*, 463 U.S. 248, 261 (1983) ("[A parent's] interest in personal contact with his [or her] child acquires substantial protection under the due process clause); *In re Ko.W.*, 774 A.2d 296, 304-05 (D.C. 2001).

[32] *See Santosky*, 455 U.S. at 760, 768-71 (holding that proof of unfitness must rise to the level of clear and convincing evidence before a parent's rights could be terminated, and observing that "until the state proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their relationship").

[33] The focus on parental fitness is also reflected in the termination procedures of other states. *See, e.g.*, *In re Ann S.*, 202 P.3d 1089, 1102 (Cal. 2009) (noting that as a matter of constitutional law, "some showing of unfitness is called for when a custodial parent faces termination of his or her rights. . . . In that circumstance, there is no dispute that the best interest of the child would not be a constitutionally sufficient standard for terminating parental rights" (internal quotation marks and citation omitted)); *In re Five Minor Children*, 407 A.2d 198, 199 (Del. 1979) (citing *Quilloin*, 434 U.S. at 255) ("The State cannot terminate parental rights by showing it is in the best interests of the children without showing the parents were unfit") (overruled on other grounds); *In re D.T.*, 818 N.E.2d 1214, 1225-27 (Ill. 2004) (explaining that *Santosky* requires clear and convincing evidence of parental unfitness, and that best interests is a separate inquiry); *In re Scott S.*, 775 A.2d 1144, 1151 (Me. 2001) (holding that a court seeking to terminate parental rights must consider parental unfitness before it separately considers the best interests of the child and noting that this holding "springs from

(. . . continued)

finding of parental unfitness and even though the parents have not raised this failure as an issue on appeal, we would be remiss in not reminding our colleagues on the trial bench of this obligation to make an independent determination of the

---

(….continued)

the mandates of the federal . . . constitution[]" which has made clear that "the State may not remove children from a parent's care solely on the basis of the best interests of the children"); *In re Rashawn H.*, 937 A.2d 177, 188 (Md. 2007) (explaining that in terminating parental rights, the Constitution requires the state to show "that the parent is 'unfit' or that 'exceptional circumstances' exist" before considering best interests of the child); *Kenneth C. v. Lacie H.*, 839 N.W.2d 305, 314 (Neb. 2013) (discussing constitutional constraints and noting that "there is no clear and convincing evidence that [appellant father] is presently unfit as a parent"); *In re J.J.B.*, 894 P.2d 994, 1003-04 (N.M. 1995) (holding that statute establishing "abandonment" as a criterion for TPR was constitutional only because "abandonment of one's child establishes parental unfitness"); *In re Kristina L.*, 520 A.2d 574, 579-80 (R.I. 1987) (explaining that the Constitution requires a finding of unfitness and that "[t]he best interest of the child outweighs all other considerations once the parents have been adjudged unfit. In essence, a finding of parental unfitness is the first necessary step"); *In re J.P.*, 648 P.2d 1364, 1376 (Utah 1982) (determining that statute providing for termination of parental rights based on the best interests of the child alone was "unconstitutional on its face" and explaining that "[u]nlike the standard of 'parental fitness,' which imposes a high burden on the state in an adversary proceeding, the standard of 'best interest' of the child provides an open invitation to trample on individual rights through trendy redefinitions and administrative or judicial abuse"); *Copeland v. Todd*, 715 S.E.2d 11, 20 (Va. 2011) (for a TPR statute "to pass constitutional due process scrutiny, [it] must provide for consideration of parental fitness and detriment to the child" because "the Constitution requires more than a mere showing of the child's best interests to terminate parental rights"); *In re A.B.*, 232 P.3d 1104, 1109 (Wash. 2010) (en banc) ("The first question here is whether a parent has a due process right not to have the State terminate his or her relationship with a natural child in the absence of an express or implied finding that he or she, at the time of trial, is currently unfit to parent the child. According to the United States Supreme Court, this court, and our Court of Appeals, the answer is yes").

fitness of birth parents. . . . In *In re S.L.G.*, we recognized that "[p]arental 'fitness' is not a statutorily defined term in this jurisdiction" but we said that "fitness refers to the parent's intention and ability over time to provide for a child's wellbeing and meet the child's needs." 110 A.3d at 1286. We further explained that the basic inquiry is "whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare." *Id.* This approach to fitness is consistent with Supreme Court precedent. As the Court stated in *Troxel v. Granville*, 530 U.S. 57, 68-69 (2000), "so long as a parent adequately cares for his or her children (i.e. is fit), there will normally be no reason for the State to interject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *See also* Part I of the separate opinion of Associate Judges Beckwith and Easterly in this case, concurring in part and dissenting, in part. In our opinion in *In re Petition of G.A.P.*, we reiterated our view as to the distinction between parental fitness and the best interest of the child. "[P]arental 'fitness' is not merely a restatement of the 'best interests of the child,' as determined by a TPR or contested adoption proceeding. 'Fitness,' rather, is an independent determination of parental 'intention and ability over time,' . . . to resolve the natural parent's capacity to 'care for the child' and protect the child

against 'undue risk of harm.'"  133 A.3d at 998 (quoting *S.L.G.*, 110 A.3d 1275, 1287 (D.C. 2015)).

Because a child's best interests are presumably served by being placed with his or her fit natural parent, *see Troxel, supra*, a finding of parental fitness will in most cases preclude a trial court from terminating a natural parent's parental rights, except for those truly "exceptional circumstance[s]" where the trial court is convinced that "a continuation of the parental relationship [between a fit parent and child is nonetheless] detrimental to the best interest of the child.'"  *Id*.  No finding was made in this case that the parents were unfit ostensibly because once they chose to support the adoption petition of E.A., as opposed to contesting the W.'s petition and seeking reunification, the trial court may have felt that such a finding was unnecessary.  However, since the adoption proceeding resulted in the termination of their parental rights, had the failure of the trial court to make a fitness determination been challenged on appeal by the parents, it is likely that a remand would have been necessary.

To require less than an independent determination of parental fitness would run counter to the Supreme Court's pronouncements in *Troxel* and *Santosky*, the

express policy of the ASFA, and the underlying purpose of the neglect process, which is not to punish parents for past wrongs, but rather to rehabilitate parents and reunite children with their families. *See In re S.L.G.*, 110 A.3d at 1286 n.24 ("While the [parental] presumption 'is not absolute' and 'must necessarily give way in the face of clear and convincing evidence that requires the court, in the best interest of the child, to deny custody to the natural parent in favor of an adoptive parent,' *the question of parental fitness is almost always at the heart of any proceeding to terminate parental rights or waive a natural parent's consent to adoption.*" *In re S.L.G.*, 110 A.3d 1275, 1286 (D.C. 2015) (emphasis added). We acknowledge that there may be "circumstances in which clear and convincing evidence will show that an award of custody to a fit natural parent would be detrimental to the best interests of the child." *Id.* (quoting *Appeal of H.R.* (*In re Baby Boy C.*), 581 A.2d 1141, 1176-79 (D.C. 1990) (Ferren, J. concurring)); *but see id.* at 1291 (citing the inability "to postulate a realistic factual situation where a 'fit' parent can be properly deprived of parental rights based on the 'best interest of the child.'") (Newman, J., concurring). Therefore, while the fitness of the parents must first be determined in any proceeding that may terminate their parental rights, if the trial court is satisfied by clear and convincing evidence that reunification of the child with the family would grievously harm the child, the presumption in favor of a fit parent raising his or her child gives way to what is in the child's best

interest. It may be the case that trial judges are considering future harm in their assessment of parental fitness consistent with the way this court articulated the fitness test in *In re S.L.G.* However, without an express fitness determination it is difficult to assess whether that is in fact the case and so the call by Judges Easterly and Beckwith for the D.C. Council to review and update our neglect and adoption statutes may prove to be helpful in this regard. *Post* at 141.

## V. "Weighty Consideration" to the Biological Parents' Preferred Caregiver

In this case, the children's biological parents and their aunt, E.A., whom the parents wanted to adopt their children, argue that the trial court, in granting the adoption petition of the W.s, failed to give weighty consideration to E.A.'s competing adoption petition as required by our case law. Under current law, biological parents who are unable or unwilling to raise their own children may choose to consent to an adoption by a preferred caregiver so that their children can be raised by someone with whom they have close familial ties. We have consistently held that when parents whose parental rights are still intact choose a custodian for their children, that choice is to be given great weight when there are competing adoption petitions before the court. *See In re T.J.*, 666 A.2d at 11.

Under such a scenario, the trial court must find by "clear and convincing" evidence that the custody arrangement preferred by the parents would clearly be contrary to the best interests of the child. *Id.* The court's rationale underlying this parental preference is the recognition that biological parents have a right to raise their children and, therefore, when biological parents consent to an adoption by one of the petitioners in a contested adoption proceeding, "the trial court cannot merely weigh the competing adoption petitions against one another, as if they began in equipoise." *In re K.D.*, 26 A.3d 772, 778 (D.C. 2011).[34] In order to recognize this parental right in a manner that is consistent with applicable presumptions and the best interest of the child standard, our case law requires the non-favored petitioner to prove by clear and convincing evidence that placement of the children with those petitioners would be detrimental to the children's best interest. If the non-favored petitioners meet that burden, they must subsequently prove by a preponderance of the evidence that granting their adoption petition is in the children's best interest before the court can waive the parents' consent and grant

---

[34] We need not address here whether the court must give weighty consideration to the preference of a biological parent who has demonstrated utter lack of regard for, or even hostility to, the best interest of the child. In such a case, at least arguably, "the parent is not competent to make . . . a decision" about a caregiver for the child. *See In re T.J.,* 666 A.2d at 11, 16. And, in any event, it may be that, in any such cases, the burden of demonstrating that it would be clearly contrary to the child's best interest to place the child with the parents' preferred caregiver would not be a difficult one.

the adoption. "Clear and convincing evidence is evidence 'which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. . . .'" *In re W.E.T.*, 793 A.2d 471, 478 n.15 (D.C. 2002) (quoting *In re Estate of Soeder*, 220 N.E.2d 547, 574 (Ohio Ct. App. 1966)). The non-favored petitioner bears the burden of establishing by clear and convincing evidence that placing the children with the parents' preferred caregiver would be contrary to the children's best interest.[35] "If the trial court has not given sufficient consideration to the [biological] parent[s'] choice . . . we have generally reversed the trial court's decision." *In re A.T.A.*, 910 A.2d 293, 297 (D.C. 2006).

Turning to the merits of this case, we must determine whether the trial court gave weighty consideration to E.A. as the preferred adoption petitioner for the children. Thus, we have to determine whether the competing non-preferred adoption petitioners, the W.s, met their burden of proving by clear and convincing evidence that the placement of Ta.L. and A.L. with E.A. would be contrary to their best interests. This is not an easy burden to prove and at the outset, we "recognize, as we always do in such cases, that it is no small matter for a court to permit the adoption of a child over the objection of a mother [or father] who loves [her]." *In*

---

[35] *In re T.W.M.*, 964 A.2d at 604 (citing *In re T.J.*, 666 A.2d at 16).

*re W.D.*, 988 A.2d at 457 (internal quotations marks and citation omitted). However, this is not a situation where the parents, themselves, are seeking reunification so the concerns raised above about protecting the rights of parents to raise their own children and the presumptions involved in that situation are not implicated here.

Here, appellants claim that Dr. Venza's attachment study involving the children and the W.s, and upon which the trial court primarily relied, did nothing to undermine the presumption favoring the choice of a caregiver by the biological parents because the attachment study did not also evaluate the children's attachment to E.A.[36] As a result, they contend that there is no evidence that placement of the children with E.A. would be detrimental to the best interests of

---

[36] Appellant E.A. also contends that the trial court erred in not considering the District of Columbia's failure to pursue a family placement with E.A. after it was determined that T.L.'s sister, K.A.-R. could not be certified as a family placement for A.L. and Ta.L. We have repeatedly held that a "child cannot be punished for the alleged wrongs of the bureaucracy." *In re L.L.*, 653 A.2d 873, 882 (D.C. 1995) (quoting *In re L.W.*, 613 A.2d 350, 355 n.11 (D.C. 1992)). At this stage, which is past the permanency goal change, "the overriding consideration is the best interest of the child . . . regardless of the defaults of public agencies in seeking reunification of the family." *In re A.C.*, 597 A.2d 920, 925 (D.C. 1991).

the children,[37] that E.A. would not be a fit caretaker for the children, or that E.A. would not be able to help the children transition to her home and care. Instead, they argue that the trial court should have "focus[ed] its inquiry on the aunt's fitness" rather than the potential harm the children would experience in being separated from their foster parents of three years. We disagree.

In granting the W.s' adoption petition and denying the petition of E.A., the trial court issued findings of fact concerning the development of the children and relied on expert testimony concerning the closeness of the relationship the children had with the W.s and with E.A. In its July 7, 2011 order, the trial court gave appropriate consideration to the relevant statutory factors set out in § 16-2353 (b) in determining that the parents were withholding consent to adoption contrary to the best interest of the child, and acknowledged in its analysis the "weighty consideration" that it gave to the parents' preference between the competing adoption petitions.

---

[37] As Dr. Venza testified, attachment is a dynamic process, and children can have attachments to several people at once. However, the trial court concluded that it was "inconceivable that the children had meaningful attachments to [E.A.]" given the limited time the children had spent with E.A. in the past three years.

While the trial court did not find that E.A. would be an unsuitable caregiver,[38] the trial court did find that placement of the children with E.A. would be contrary to their best interests before granting the W.s' adoption petition. The trial court's finding was based primarily on expert testimony that the children risked short- and long-term psychological harm if their attachments to their pre-adoptive foster parents, R.W. and A.W., were broken. While the qualities of the particular person the biological parents favor is always critical to the court's inquiry, the primary issue the court must grapple with, as discussed *infra*, is whether there is clear and convincing evidence that the favored custodial arrangement, including continuation of the relationship between the natural parents and the children, would be clearly contrary to the best interests of the children. *In re T.W.M.*, 964 A.2d at 604 (citing *In re T.J.*, 666 A.2d at 16).

_____

[38] We emphasize again that in neglect and adoption proceedings, preservation of natural parents' constitutionally-protected right to the care, custody, and management of their child demands a strong presumption in favor of placing the child in the care of the natural parent unless the parent is first proven to be "unfit." *See In re S.L.G.*, 110 A.3d at 1285-86. The court "cannot constitutionally use the 'best interests' standard to terminate the parental rights of a 'fit' natural parent, and instead, grant an adoption in favor of prospective adoption petitioners simply because they are 'fitter.'" *Id.* at 1287-88 (internal quotation and citation omitted). This presumption, however, does not apply in favor of a designated caregiver herself. E.A. asserts that the trial court erred in not focusing its analysis on her own fitness, but this assertion is unavailing because she is not entitled to the same presumption favoring "fit" natural parents. Instead, her designation by the natural mother as the preferred caregiver is entitled to "weighty consideration" as articulated herein.

In answering that inquiry, and in addition to the attachment study prepared by Dr. Venza, the trial court appeared to rely in part on the testimony of Dr. Frank who conducted a bonding study but testified that breaking the children's "attachment" to the W.s would harm the children. Dr. Frank's testimony appears to have conflated or, at a minimum, blurred the lines between the bonding and attachment studies and it is not clear whether the trial court fully recognized the misstatement. Thus, to the extent the trial court relied on Dr. Frank's bonding study to make findings focused on *attachment*, that reliance was misplaced. While a bonding study carries some weight in an analysis of the best interest of the children, it does not carry the same weight as an attachment study, which according to the evidence presented at trial, has a stronger correlation to emotional attachment and which, if broken, could cause significant harm to the children. Therefore, while it is possible that an attachment study might adequately support a finding by clear and convincing evidence that placement of the children with someone other than the person to whom they are attached would be detrimental to their best interests, the same cannot be said for a bonding study because children can bond with more than one individual. When this case was originally before a division of this court, the panel was not convinced of the significance of the distinction being drawn between a bonding study and an attachment study and,

therefore, was reluctant to rely on either one or both as adequate support for the trial court's decision in this case to grant the adoption petition of the W.s over E.A. who, by all accounts, also enjoyed a positive relationship with the children. Further, the panel was concerned that a "one-sided attachment study" prepared by the W.'s expert without a corresponding study measuring the attachment the children had to E.A. was not an appropriate or balanced way of measuring the harm to the children caused by removing them from the care and custody of the W.s. On *en banc review*, however, those concerns are no longer shared by those on the panel or our colleagues who join this part of the opinion. We are satisfied that the record supports the trial court's finding that breaking the children's attachment to the W.s would significantly harm them,[39] and that is especially the case now that the children have been in the W.'s care for an exceedingly long period of time.

_____

[39] While attachment studies are a significant consideration in the weighty consideration analysis, we caution that there are also other important considerations for the trial court when weighing a preferred caregiver's petition for adoption with that of a non-preferred caregiver, such as the appropriateness of the preferred caregiver; preservation of extended family ties (a policy reflected in District of Columbia law); and issues pertaining to racial, cultural, and family identity, among others. *See In re T.J.*, 666 A.2d at 5, 14.

Here, the trial court, in relying primarily on Dr. Venza's attachment study found that A.L. had a secure attachment, and Ta.L. had an anxious avoidant attachment, to A.W. The court also credited Dr. Venza's testimony that the children had a primary attachment to A.W. and that they viewed the W.s as their primary caregivers. Most importantly, Dr. Venza testified that severance of this type of attachment will necessarily cause significant harm to the children, regardless of the qualities of the person who serves as their subsequent caregiver.

In addition to the testimony by Dr. Venza and Dr. Frank, Dr. Missar, appellants' expert at trial, also acknowledged the value of attachment studies and conceded that "moving children who are securely attached does carry with it some psychological risk." Based on this evidence, the trial court concluded that there was clear and convincing evidence in the record that the custodial relationship preferred by the biological parents with an otherwise fit and suitable caregiver would clearly be contrary to the children's best interest. Because the trial court's conclusion is supported by our prior decisions in a line of similar cases, we have no basis to disagree here. *See, e.g.*, *In re T.W.M.*, 18 A.3d 815, 821 (D.C. 2011) (holding that based on undisputed evidence that the prospective adoptee had a secure attachment to the foster parent, there was clear and convincing evidence that

removing the child from the foster parents' care would be contrary to the child's best interests *even though the parents' preferred caregiver, a relative, was fit to care for the child*); *In re R.E.S.*, 19 A.3d at 791 (approving the trial court's reliance on the child's lack of relationship with the preferred relatives, and the child's clear attachment to the foster parent, in concluding that the child's best interests were served by granting the foster parent's adoption over the biological parent's objection).  Thus, we are satisfied that the trial court did not abuse its discretion in this case.  We reiterate the great importance of stability and continuity this court has recognized in evaluating the best interest of child.  *See Rutledge v. Harris*, 263 A.2d 256, 257-58 (D.C. 1970) ("[A] stable and desired environment of long standing should not lightly be set aside.").


While the expert testimony offered by both the appellant and appellee also recognized the fact that a positive environment in E.A.'s home could have a mitigating effect on the risk of harm to the children, the attachment study and the compelling testimony of the W.s and their  experts—credited by the trial court and undisputed by E.A.'s expert—convinces us that disruption of the children's attachments with the W.s would pose "unacceptably grave" risks to the children's short- and long-term psychological, intellectual, and social development.  We are

satisfied that the W.s have produced clear and convincing evidence that granting E.A.'s adoption petition would have been contrary to the best interest of the children and therefore, the W.s successfully met their burden. Thus, the trial court's decision to grant the W.'s adoption petition over the petition filed by E.A. is supported by the evidence in the record.

## VI. Conclusion

For the above reasons, we hold that: (1) permanency goal review hearings must be conducted in a manner that protects the due process rights of parents; (2) the trial court must find by a preponderance of the evidence that the government has made reasonable efforts to help the parents achieve reunification with their children consistent with the neglect plan that was developed for that purpose before the trial court can change the goal of a neglect proceeding from reunification to adoption; (3) a change of the presumptive goal of a neglect proceeding from reunification to adoption is an appealable final order; and (4) prior to the termination of parental rights, either through a TPR or through an adoption proceeding, a finding of parental unfitness must first be made by the trial court unless truly exceptional circumstances exist or the parents have otherwise stipulated to their continued unfitness.

Having reviewed the permanency goal review hearing in this case, we are satisfied that even had the rights discussed herein been afforded to the parents in that proceeding, including the right to appeal the trial court's decision to change the goal to adoption, the outcome would not have been different. The government's evidence supports a finding that it made reasonable efforts to assist the parents in meeting the requirements contained in their reunification plan. Further, there was clear and convincing evidence in the record to support the trial court's findings that: (1) adoption by E.A. was detrimental to the children's best interest; (2) the biological parents were withholding consent to the W.s' petition to adopt contrary to the best interests of the children; and (3) adoption by the W.s was in the children's best interest.

Thus, the judgment of the trial court is

*Affirmed.*

GLICKMAN, *Associate Judge*, with whom FISHER and MCLEESE, *Associate Judges*, join in full, and THOMPSON, *Associate Judge*, joins in Parts III and IV,

concurring and dissenting:  This contested adoption case concerns the fate of two grievously neglected children.  The sole question actually presented on appeal is a narrow one:  whether the trial court properly considered psychological attachment evidence regarding how these children would be harmed if removed from their foster parents.  Somehow, though, in the course of prolonged appellate gestation, the case has been transformed into a judicial battleground over settled law and a vehicle for the majority to effect far-reaching changes in our law – changes that we think will be detrimental to abused and neglected children in the District of Columbia.  At stake is the fundamental proposition embodied in our statutes and enshrined in our cases, that the paramount consideration when determining parental rights and child placements is the best interest of the child.

This court did not set out to overhaul our law.  It granted rehearing en banc simply to reconsider a new rule announced in the division's opinion severely limiting the use of psychological attachment studies to determine the child's best interest in contested adoption proceedings.  The division held that a trial court may rely on an attachment study to find that the weighty consideration due the biological parents' preference for a competing caregiver has been overcome "only if the preferred caregiver has also been given the opportunity to have a meaningful

attachment or bonding study conducted between him or herself and the children, and the study concludes that an appropriate attachment or bond with the preferred caregiver has not or is not likely to occur."[1]  In seeking en banc rehearing, the guardian *ad litem* and the foster parents challenged this rule as unprecedented, unsound, and incompatible with the best-interest-of-the-child standard.

Having now had the opportunity to consider the matter en banc, the court has decided to abandon the rationale on which the division based its ruling. Suffice it to say that the court's *sub silentio* rejection of the rule fashioned by the division reflects the fact that no judge on this court is in favor of it.  We recognize that the restriction on the trial court's consideration of attachment studies in contested adoption proceedings is unsound because severing a child's strong attachment to her foster parents may be traumatic and harmful to the child regardless of whether she is attached to an alternative caregiver, whoever that might be.  The en banc majority therefore is entirely right, in our view, to uphold the trial court's reliance on Dr. Venza's study of the children's attachment to their foster parents even though Dr. Venza did not evaluate the possibility that the

---

[1]  *In re Ta.L.*, 75 A.3d 122, 133 (D.C. 2013), *vacated*, 91 A.3d 1020 (D.C. 2014).

children could develop an attachment to their aunt. *Ante* at 51-53. Accordingly, we are pleased to join with the majority of our colleagues (all of them except Judges Beckwith and Easterly) in affirming the trial court's decision to grant the foster parents' adoption petition in this case. We believe the evidence in its totality, including but not limited to the testimony of the child psychologists, overwhelmingly supports the court's determinations that the biological parents withheld their consent to the foster parents' adoption petition contrary to the children's best interests, and that placement of the children with their aunt would not be in their best interests.[2]

_____

[2] We base our conclusion that the evidence supported the trial court's decision on the evidence introduced at the hearing in the trial court rather than on factual assertions contained in the briefs on appeal. The trial court relied, in part, on the results of Dr. Venza's study of the children's attachment to their foster family and the unrebutted testimony of all three child psychologist witnesses describing why and how the children would be harmed if they were removed from their foster parents. (We do not agree with the suggestion that the trial court erred by relying on Dr. Frank's bonding study, or with the view that bonding studies in general have little probative value in this context. *See ante* at 50.)

The expert psychological testimony was not the only evidence undergirding the trial court's determinations, however. The foster parents' petition was supported as well by the children's pediatrician and the social workers who had worked with the children and their families. In addition, the court received powerful evidence of the children's sickly, emaciated, and developmentally arrested condition at the time they were removed from their parents' custody, and of how the children had thrived in response to the loving care and attention to their special needs provided by the foster parents. There was evidence, too, of the aunt's inability or unwillingness to appreciate and address the children's medical

(. . . continued)

We write separately to express our disagreement with the unwarranted transmutation of this case into an instrument for rewriting our law in other areas. No one asked us to grant rehearing en banc in order to overturn this court's holding in *In re K.M.T.* that "an order changing a permanency planning goal is not final or appealable" as of right.[3] Our colleagues' discussion and resolution of this issue has absolutely no bearing on the outcome of the present appeals. *See ante* at 54-55. The same holds true for the majority's *sua sponte* declaration that parental rights may not be terminated without a predicate finding of parental unfitness. With this dictum, a bare majority of the court unnecessarily reaches out to disavow this jurisdiction's settled constitutional precedent on a matter of fundamental importance, and it does so without the benefit of notice to, or briefing by, the parties or their *amici*. In our view, which we explain in Part I of this opinion, the foregoing issues (as well as the issues broached for the first time in the separate opinion of Judges Beckwith and Easterly) are not properly before us.

---

(….continued)

and developmental problems and to protect them from their biological parents' mistreatment.

[3] 795 A.2d 688, 690 (D.C. 2002).

Nonetheless, because our colleagues have chosen to decide these issues, we are compelled to respond on the merits. And on the merits, we respectfully dissent. In Part II, we explain why orders changing a child's permanency goal are not appealable final orders, and why allowing immediate interlocutory appeals of those orders as of right is contrary to governing law and detrimental to at-risk children in foster care.

In Part III, we argue that our colleagues' elevation of parental rights over the best interests of the child in termination of parental rights (TPR) and contested adoption proceedings is contrary to decades of prior decisions of this court and not required by the Supreme Court decisions on which the majority relies. Our colleagues fail to appreciate how the vital interests of children may conflict with and outweigh their biological parents' interests and preferences. We believe it to be well-settled that the Constitution and our governing statutes permit even fit parents' rights to be terminated when necessary to protect a child from harm because the child's best interest is paramount.

Lastly, in Part IV, we rebut the contention, advanced only by Judges Beckwith and Easterly, that fit parents have a presumptive constitutional right to

"control" who will adopt their children even where (as in the present case) their choice would be detrimental to the children's best interests. *Post* at 156-157. For different reasons, we agree that our judge-made doctrine requiring a court to give "weighty consideration" to whichever adoption petition the biological parents prefer is problematic and should be re-examined. But we think such re-examination should await a case in which jettisoning the requirement of special deference would affect the outcome.

In their separate opinion, Judges Beckwith and Easterly go on to address the Council of the District of Columbia directly and call for legislation to replace our supposedly "inadequate" statutes governing adoption and termination of parental rights. *Post* at 140-41, 151-155. Our colleagues object to our current statutes because they establish the best interest of the child, and not parental fitness, as the primary test governing adoption and TPR decisions. Although we see no need to further discuss our colleagues' legislative suggestions, we do note that we strongly disagree both with our colleagues' view that our current statutes are constitutionally inadequate and with many of their specific suggestions for revision.

### I. The Court Errs By Undertaking to Decide Issues Not Properly Presented in These Appeals.

"The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."[4] Thus, even when it sits en banc, this court has no "roving commission[]" to pass judgment at whim on the interpretation and validity of our laws.[5] Rather, "[c]ourts should not decide more than the occasion demands."[6] The principles of forfeiture, waiver, and materiality to the controversy at hand are meant to restrain courts from overreaching and deciding questions when it is unnecessary, unwise, and inappropriate to do so. Moreover, fairness to parties who have a stake in the resolution of an issue and the desirability of receiving their informed input require that they be given notice and an opportunity to be heard before the court undertakes to reach a decision. Regrettably, our colleagues ignore these well-established principles.

_____

[4] *Ford v. United States*, 533 A.2d 617, 624 (D.C. 1987) (en banc) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)); *accord Rose v. United States*, 629 A.2d 526, 536-37 (D.C. 1993).

[5] *See Broadrick v. Oklahoma*, 413 U.S. 601, 610-11 (1973).

[6] *District of Columbia v. WICAL Ltd. P'ship*, 630 A.2d 174, 182 (D.C. 1993) (quotation marks and citation omitted).

To begin with, because the biological parents did not seek to be reunified with their children or oppose the change of permanency plan to adoption, we think the majority is incorrect in stating that these appeals raise "serious concerns" about *In re K.M.T.*'s holding. *Ante* at 3. In fact, while the biological parents complain on appeal about the effects of permanency goal changes and urge us to permit interlocutory appeals from them as of right, they did not present these complaints in the trial court despite multiple opportunities to do so.[7] They did not seek an evidentiary hearing on the change in goal or claim they were prejudiced by the supposed deprivation of such a hearing. They did not dispute the material accuracy or the sufficiency of the magistrate judge's factual findings underlying the change in goal, and they did not request additional findings.[8] They conceded in the trial court proceedings that they had not complied with the conditions for

_____

[7] The children's aunt has not raised any challenges to the permanency goal changes.

[8] The magistrate judge changed the children's permanency goals at a permanency review hearing after the children had been in foster care for approximately fourteen months because, in that time, the biological parents had not (1) complied with court-ordered drug testing and drug treatment, (2) regularly attended couples' counseling (despite their history of domestic violence that had led to their own arrests and their children's removal), (3) secured stable housing or employment, (4) consistently visited their children, or (5) involved themselves in their children's medical care and National Children's Center Services.

reunification.     They did not maintain that they were fit to care for their children or advocate for the children to remain in foster care (rather than be adopted) while they continued to work toward reunification.  The biological parents did not claim that the Child and Family Services Agency (CFSA) had failed to make reasonable efforts to help them achieve reunification, and they did not object to any supposed discontinuation or curtailment of those efforts attendant on the goal change.[9] Furthermore, the biological parents did not challenge or appeal the goal change. Even now, on appeal from the final adjudication, they have not claimed that the magistrate judge abused her discretion in deciding that the children's permanency goal should be changed to adoption.  The division acknowledged this when it concluded that "this case is not the appropriate vehicle for reconsidering" *In re K.M.T.*, and that "had an appeal been taken from the order changing the

_____

[9]  In fact, even after the goal change, the CFSA continued to facilitate the services ordered for the biological parents and their visitation with their children. The biological parents did not demonstrate improvement, however.

Of particular note, the biological mother gave birth to another son a year after the permanency goal was changed.  When he was four months old, this child had to be removed from the biological parents' care after another incident of domestic violence, in which he sustained a severe head injury that resulted in hemorrhaging in his brain.  In the ensuing neglect case, the biological mother was ordered to drug test, attend parenting classes, undergo a mental health assessment, and participate in individual therapy and visitation.  She was not compliant.

permanency goal from reunification to adoption there would not have been a different outcome."[10]

Following the goal change, the biological parents chose not to pursue reunification with their children and not to oppose adoption as the goal. At a subsequent permanency hearing in November 2009, they supported the adoption petition of the aunt. They never contended that the goal change prevented or impeded them from opposing the termination of their parental rights or the competing adoption petition filed by the foster parents.

In addition, the biological parents told the trial court that a finding of their own unfitness to parent the children was unnecessary because they were not seeking to preserve their parental rights. Even on appeal they have not argued that the trial court erred in terminating their rights without a finding of unfitness.

_____

[10] *In re Ta.L.*, 75 A.3d at 130 & n.4 ("There is nothing in the record to suggest that [the biological parents] were in substantial compliance with the trial court's order or that they were moving towards reunification in a timely fashion. Moreover, appellants are not challenging on appeal the trial court's decision that the permanency goal be changed from reunification to adoption[.]").

In short, the biological parents waived or forfeited any claim of error in connection with the goal change, including any claim that they should have been able to appeal it,[11] and any claim of error in connection with the lack of an express finding of their unfitness. For that reason alone, this court should not undertake to address any of these issues in this case.[12] There is no necessity for the en banc court to depart from settled principles constraining judicial review – especially with respect to a constitutional claim not even raised on appeal.[13]

_____

[11] *In re Antj.P.*, 812 A.2d 965, 968 (D.C. 2002) (holding that biological mother forfeited her claim that the agency "failed to provide adequate services geared to her special needs so that she could be reunited with her children" when she raised it for the first time in her appeal from the termination of her parental rights) (internal quotation marks omitted).

[12] *D.D. v. M.T.*, 550 A.2d 37, 48 (D.C. 1988) ("Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal.") (quoting *Miller v. Avirom*, 384 F.2d 319, 321-22 (D.C. Cir. 1967)); *see also, e.g.*, *Williams v. Gerstenfeld*, 514 A.2d 1172, 1177 (D.C. 1986) ("As a general rule, matters not properly presented to a trial court will not be resolved on appeal. . . . A court deviates from this principle only in exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record.").

[13] *See Rose v. United States*, 629 A.2d 526, 536-37 (D.C. 1993) ("Where counsel has made no attempt to address the issue, we will not remedy the defect, especially where important questions of far-reaching significance are involved. . . . This is not to say an appellate court is absolutely precluded from reaching an issue *sua sponte*; it is not. . . . But even when the courts have elected to do so, as in a *sua sponte* analysis of harmless error, . . . they have done so only when a statute required it or when the record was not complex and resolution of the issue was

(. . . continued)

One result of the biological parents' forfeiture and waiver is the absence of a record showing that they were prejudiced by the unavailability of an immediate appeal of the permanency goal change or by any of the alleged evidentiary deficiencies in the permanency hearing our colleagues identify on their own. In fact, as the division recognized, the goal change was advantageous to the biological parents because "[t]he trial court, by changing the permanency goal to adoption, provided the impetus for CFSA to become involved in providing services to [the aunt] and thus effectively helped facilitate [the biological parents'] goal of placing the children with [her]."[14] We shall see that the lack of record support also undermines key factual assertions made in the majority opinion to justify its legal conclusions regarding goal changes.[15]

---

(….continued)

easy, beyond serious debate.") (internal punctuation, brackets, citations and footnotes omitted).

[14] *In re Ta.L.*, 75 A.3d at 130.

[15] In response to our objections, the majority argues that we have discretion to consider the appealability of permanency goal changes because the question is purely one of law, the factual record is complete, and a remand for further factual development would serve no purpose. *Ante* at 18-19 (citing *Pajic v. Foote Prop., LLC*, 72 A.3d 140, 145-46 (D.C. 2013), and *District of Columbia v. Helen Dwight Reid Educ. Found.*, 766 A.2d 28, 33 n.3 (D.C. 2001)). But those conditions are not

(. . . continued)

As the government aptly says in its brief, because the issues regarding permanency goal changes have no bearing on the parties' rights and no effect on the outcome of these appeals, what the biological parents (and the *amici* supporting them) have requested (and now, in the majority opinion, received) from this court is nothing more than an advisory opinion on those issues. The same is true of the majority's *sua sponte* discussion of the need for a finding of unfitness to support a termination of parental rights.

"An issue is ripe for adjudication only when the parties' rights may be immediately affected by it."[16] Our judicial duty "is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot

---

(….continued)

met here, for the absence of any meaningful factual record and the consequent dubiousness of the majority's key factual assertions impair this court's ability to give an informed answer to the legal question presented. Furthermore, of course, we normally exercise our discretion to address a question raised for the first time on appeal only when we find it necessary to do so because the answer would affect the outcome of the appeal and prevent a clear miscarriage of justice – not when, as here, the answer concededly is irrelevant to the outcome and does not correct any injustice in the matter.

[16] *Allen v. United States*, 603 A.2d 1219, 1228 n.20 (D.C. 1992) (en banc).

questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."[17]  Accordingly, "as a general rule, this court will decide only such questions as are necessary for a determination of the case presented for consideration, and will not render decisions in advance of such necessity, *particularly when the question is a constitutional one, or involves the construction of a statute*."[18]  Except in extraordinary circumstances not present here, we do not issue advisory opinions. Our colleagues ignore this "basic limitation upon the duty and function of the [c]ourt."[19]

Finally, in elevating the rights of putatively fit parents over the welfare and rights of their children, our colleagues render an unrequested and potentially transformative constitutional ruling without having afforded the parties and their *amici* the opportunity to brief the issues.  We suspect this will come as a particular

---

[17]  *Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)); *accord, In re D.T.*, 977 A.2d 346, 352 (D.C. 2009).

[18]  *District of Columbia v. WICAL Ltd. P'ship*, 630 A.2d 174, 182 (D.C. 1993) (quoting *Johnson v. Morris*, 557 P.2d 1299, 1305 (Wash. 1976) (en banc)) (emphasis added; brackets omitted).

[19]  *Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union*, 361 U.S. at 368.

shock to the institutional litigants in this case that will continue to be involved with regularity in TPR and contested adoption cases – the District and the Children's Law Center. It is ill-advised, unfair to the parties, and contrary to this court's norms to proceed in this manner. In the past, when this court has considered deciding an appeal on a basis "the parties fail[ed] to identify and brief," we have taken pains to "ensure procedural fairness . . . by providing each party with the opportunity to brief" the issue.[20] The court has no justification for deviating from that rule of basic fairness here.

Our disagreement goes beyond the inappropriateness of deciding important constitutional and statutory issues that are not properly before us in these appeals. We disagree with our colleagues' resolution of those issues on their merits as well.

_____

[20] *Randolph v. United States*, 882 A.2d 210, 226-27 (D.C. 2005); *see also id.* at 226 ("[N]o matter whose ox is gored, this court has frequently requested post-argument briefing of issues not adequately raised by counsel, to the end that, after both parties have been fully heard, the court is in the best position to render a sound decision.").

## II. A Change in a Child's Permanency Goal From Reunification to Adoption Is Not a Final Order

With exceptions not relevant here, this court's jurisdiction over appeals from the Superior Court is confined by statute to the review of "final" orders and judgments.[21] "Normally, an order or judgment is deemed final 'only if it disposes of the whole case on its merits so that the court has nothing remaining to do but to execute the judgment or decree already rendered.'"[22] This court held in *In re K.M.T.* that "an order changing a permanency planning goal is not final or appealable" because "it is only a step toward the final act of adoption and does not yet affect or alter the parent's legal rights with respect to the children."[23] In our view, this holding was and remains correct.

---

[21] D.C. Code § 11-721 (a)(1) (2012 Repl.); *Rolinski v. Lewis*, 828 A.2d 739, 745 (D.C. 2003) (en banc). Review of a magistrate judge's decision by an associate judge of the Superior Court (which is a prerequisite to any review of that decision by the Court of Appeals) similarly is limited to "final" orders and judgments. *See* D.C. Fam. Ct. R. D (e)(1)(a) & cmt.

[22] *Rolinski*, 828 A.2d at 745-46 (quoting *In re Estate of Chuong*, 623 A.2d 1154, 1157 (D.C. 1993) (en banc)).

[23] *In re K.M.T.*, 795 A.2d 688, 691 (D.C. 2002).

Yet the majority overrules *In re K.M.T.* It reasons that a change in the permanency goal from reunification to adoption is "effectively a final order" even though more remains to be done, *ante* at 25-26 n.18, and that "an order need not necessarily be the last one in a proceeding" to be final. *Ante* at 24 (citing *District of Columbia v. Tschudin*[24]). In our view, however, the majority errs both factually and legally in its characterization of the effects of a goal change from reunification to adoption. The goal change does not satisfy the finality requirement of our jurisdictional statute because it is not conclusive in itself and does not satisfy the strict requirements of the collateral order doctrine.

Preliminarily, it should be noted that the question of our appellate jurisdiction is only statutory, not constitutional. Although the majority opinion might be read to suggest otherwise, *see ante* at 22, 24-25, for over a century the Supreme Court has reiterated that the availability of appellate review is not a component of due process of law.[25] The Supreme Court has specifically

---

[24] 390 A.2d 986, 988 n.1 (D.C. 1978).

[25] *See Evitts v. Lucey*, 469 U.S. 387, 393 (1985); *Chaffin v. Stynchcombe*, 412 U.S. 17, 24 n.11 (1973); *Griffin v. Illinois*, 351 U.S. 12, 18 (1956); *McKane v. Durston*, 153 U.S. 684, 687 (1894); *see also Howell v. United States*, 455 A.2d 1371, 1372 (D.C. 1983) (en banc).

recognized that the Due Process Clause does not guarantee a right to appeal decisions terminating parental rights.[26] Consistent with this precedent, our court has held that a parent has no due process right to appeal an order placing her child in shelter care, even though such an order deprives the parent of physical custody of the child indefinitely pending the outcome of neglect proceedings.[27] If there is no due process right to appeal decisions terminating parental rights or indefinitely depriving a parent of physical custody of her child, there surely is no due process right to appeal mere goal changes.

### A. Changing the Permanency Goal From Reunification to Adoption Is Not Tantamount to a Termination of Parental Rights

The majority asserts repeatedly that a change in the permanency goal from reunification to adoption is effectively equivalent to a final termination of parental rights. It is, the majority declares, "a critical point in the proceedings, one that

---

[26] *See M.L.B. v. S.L.J.*, 519 U.S. 102, 110-11, 120, 124 (1996) (holding that while the Fourteenth Amendment does not guarantee a right to appellate review of a TPR decision, once a state affords that right, it may not effectively deny review to indigent parents by conditioning appeals on their ability to pay record preparation fees).

[27] *See In re. S.J.*, 632 A.2d 112, 112 (D.C. 1993) (dismissing appeal for lack of jurisdiction).

often irreversibly dictates the result of a child's ultimate custody disposition at a subsequent adoption proceeding." *Ante* at 25. Elaborating, the majority asserts that goal change orders "modify the fundamental terms of the custody order in the neglect proceeding and mark a critical point in time when the role of CFSA changes from a supporter of family reunification to an advocate for breaking up that same family." *Ante* at 33[28] Relatedly, the majority repeatedly asserts that the government must rebut a "presumption in favor of reunification" before the goal can be changed to adoption, *ante* at 31, 33, implying that the change in goal effects a change of some kind in the parent's legal rights or status.

These and similar assertions by the majority are incorrect and unsupported by the record before this court. First, a goal change from reunification to adoption does not constitute a termination of the biological parents' rights, preclude familial reunification, or otherwise alter the parents' legal relationship with their children. Moreover, it is misleading at best to speak in the permanency planning context of a "presumption in favor of reunification" with biological parents found to have abused or neglected their child. The child is in foster care because the presumption "that it is generally preferable to leave a child in his or her own home" already was

_____

[28] *See also ante* at 21; *id.* at 25-26 n.18.

rebutted at the disposition hearing following the adjudication of neglect, when the court determined that the child would not be safe ("cannot be protected") in the home of the biological parents.[29] This determination was immediately appealable as of right.[30] That reunification thereafter may be a *goal* that the parents may attain by making "progress . . . toward alleviating or mitigating the causes necessitating [the child's] placement in foster care"[31] does not make reunification a *presumption.*[32]

---

[29] D.C. Code § 16-2320 (a)(3), (a)(3)(C) (2012 Repl.).

[30] *See In re Na.H.,* 65 A.3d 111, 114 (D.C. 2013) ("In neglect cases, the disposition is the final order.").

[31] D.C. Code § 16-2323 (b)(4) (2012 Repl.).

[32] Furthermore, under ASFA and our implementing legislation, any presumption in favor of pursuing reunification evaporates after the child has remained in foster care for a protracted period of time. Specifically, after a neglected child has been in foster care for fifteen of the most recent twenty-two months, the government "shall" file a TPR motion unless the court finds a "compelling reason" that it would be contrary to the child's best interest to do so D.C. Code § 16-2354 (b)(3)(A), (g)(2) (2012 Repl.); *see also id.* § 16-2355 (2012 Repl.) (requiring court to "determine why a motion to terminate the parent and child relationship has not been filed" after specified periods of time have elapsed following the neglected child's commitment to the custody of a department, agency, or institution). These provisions are not compatible with a broad presumption in favor of reunification even after a prolonged period of foster care.

Second, a goal change does not alter the terms of the disposition order entered following the adjudication of the child as neglected.[33]  Third, as the majority concedes, the change in goal is not "irreversible."[34]

Fourth, a change in the permanency plan to adoption does not "preordain" or "dictate" the outcome of any subsequent TPR or adoption proceeding.  *Ante* at 20, 25.  It does not constitute a determination that the biological parents are unfit; it has no collateral estoppel or res judicata consequences; it does not relax or reduce the evidentiary burdens on the government and the adoption petitioners in the TPR

_____

[33]  The disposition orders in the present case committed the two neglected children to the care and custody of CFSA pursuant to D.C. Code § 16-2320 (a)(3).  This disposition remained unchanged until the final decrees of adoption were entered.  The goal change order did not change the children's placement or their caregivers.  We therefore believe it incorrect to say that goal change orders "modify the fundamental terms of the custody order in the neglect proceeding."  *Ante* at 33.

[34]  The majority asserts that "[w]hile it is ostensibly possible for the biological parents to attain reunification notwithstanding a decision by the trial court to grant a permanency goal change, *this very rarely occurs in practice*."  *Ante* at 21-22 (emphasis added).  The cases cited by the majority do not support this factual claim, and we are aware of nothing in the record or elsewhere that substantiates it.  But even if it were accurate, it would not establish that changing the permanency goal to adoption is ever the *reason* for the biological parents' subsequent failure to attain reunification, let alone that there is a robust causal relationship.  It is equally possible that trial courts are correctly changing the permanency goal to adoption because there is no reasonable prospect that the biological parents will be capable of attaining reunification.

and adoption proceedings; it does not limit the parents' participation in those proceedings; and it is not a factor in the trial judge's findings and conclusions therein. At one point, the majority opinion states that the biological parents are "forced" by the goal change "to make a Hobson's choice" between contesting the adoption petition of a "stranger" and consenting to adoption by a family member. *Ante* at 4. That too is incorrect. The goal change leaves the biological parents entirely free to oppose the termination of their parental rights and to argue in the alternative that, if their rights are to be terminated, it is in their child's best interest for the court to grant whichever competing petition they favor.[35]

Fifth, the change in goal does not mandate or cause the curtailment of reasonable efforts by the CFSA to reunify the family. The law is otherwise. In many (though not all) cases of parental abuse and neglect, the CFSA is obligated to undertake "reasonable efforts . . . to preserve and reunify the family . . . [and] make it possible for the child to return safely to the child's home."[36] There is no

_____

[35] *See, e.g.*, *In re F.N.B.*, 706 A.2d 28, 30 (D.C. 1998).

[36] D.C. Code § 4-1301.09a (b)(1), (3) (2012 Repl). The statute provides that "[i]n determining and making reasonable efforts under this section, the child's safety and health shall be the paramount concern." *Id.* § 4-1301.09a (a). Reasonable efforts to preserve the child-parent relationship "shall not be required"

(. . . continued)

statutory requirement or presumption that these efforts shall be terminated when a child's permanency plan changes to adoption. Rather, the statute specifically allows "[r]easonable efforts to place a child for adoption [to be] made concurrently with the reasonable efforts required [to preserve and reunify the family]."[37] Such concurrent efforts do not require court approval.

Even so, the majority insists that if not as a legal matter, then in actual practice and effect, "[w]hen a child's permanency goal is shifted from reunification to adoption, government resources and services are also shifted away from facilitating reunification, and instead, focus on finding and supporting potential new and permanent placements for the child." *Ante* at 21. In this way, the majority asserts, goal changes deprive "fragile families" of services "essential to achieving their reunification goals," *ante* at 36, and "severely hamper[]" biological parents' "efforts to build or maintain a positive relationship with their child." *Ante* at 22. "These changes," the majority declares, "can devastate parent-child

_____

(….continued)

if there has been a judicial determination that the parent subjected any child to cruelty or engaged in other specified wrongdoing, if the parent's parental rights have been terminated involuntarily with respect to a sibling, or if the parent is required to register with a sex offender registry. *Id.* § 4-1301.09a (d).

[37] *Id.* § 4-1301.09a (f).

relationships" even if reunification remains a concurrent goal with adoption. *Ante* at 36. It is on the purported truth of these serious charges that the majority bases its conclusion that immediate appellate review is necessary because goal changes "tend[]" to make the granting of an adoption petition and the termination of parental rights a "*fait accompli*." *Ante* at 22.

But are these and similar broad generalizations made by our colleagues actually *true*? Are they grounded in fact? Or, as one might suspect given the dearth of specifics and hard evidence, does the majority's conclusion rest on a weak foundation contrary to the typical realities of child neglect, foster care, and CFSA's efforts to reunify families? These questions beg to be asked because the majority cites nothing to substantiate its allegations. It offers nothing beyond its vague assurance that they are "not without support in the record of this case and many others." *Ante* at 21.

We have found no support "in the record of this case" for the claim that a goal change from reunification to adoption results as a practical matter in the withdrawal of assistance to the biological parents and interference with their efforts to rehabilitate themselves and recover their neglected children. On the contrary,

the record before us actually shows that even after the goal change, the CFSA continued without interruption to furnish the court-ordered reunification services to the biological parents and facilitate their visitation with the children. The biological parents make unsupported assertions in their brief that they and their children "lost assistance in being reunified" and had "to fend for themselves,"[38] but those assertions appear to be false. Not only that, the goal change paved the way for the CFSA to provide services to the children's aunt when she emerged as the biological parents' preferred caregiver.

The majority cites nothing for the proposition that "many other" cases support its claim, and we are unaware of such supporting authority. The government represents that it actually is the CFSA's general "practice [to] afford[] biological parents the opportunity even after a goal of adoption has been set to maintain a relationship with the child and show that the goal should be changed back to reunification."[39] We have no reason to disbelieve this representation absent evidence to the contrary; the neglect statute permits such concurrent efforts, which are meant to foster the important public policy of avoiding unnecessarily

---

[38] Br. for Appellants T.L. & A.H. at 24.

[39] Br. for Appellee District of Columbia at 68-69.

prolonged stays in foster care while still keeping alive the potential for reunification.

It is argued that reunification efforts *may* be discontinued if it is determined that they would be "inconsistent with the child's permanency plan."[40] Perhaps this occurs in some cases, though not surprisingly (given the irrelevance of the appealability issue to these appeals) the record before this court is uninformative as to when, why, how often, or to what extent. But as the present case vividly illustrates, a goal change to adoption need not entail the discontinuation of reasonable efforts in furtherance of family reunification. Ordinarily, assisting the biological parents with visitation and a range of rehabilitative services (anger management and domestic violence assistance, parent training, counseling, mental health services, substance abuse treatment, and so forth[41]) is compatible with the CFSA's simultaneous support for an adoptive placement.

---

[40] D.C. Code § 4-1301.09a (c).

[41] *See* D.C. Code § 4-1301.02 (20).

In any event, as we explain below, the appealability of a denial of critical reunification services to which the biological parents might claim a legal entitlement is a different question from the appealability of a change in a child's permanency plan, and it may have a different answer.

### B. A Permanency Goal Change From Reunification to Adoption Is Not a "Final Order" Under the Collateral Order Doctrine

Even if it were shown that, as a practical matter, changing a child's permanency plan from reunification to adoption adversely affects the biological parents' efforts to regain custody, that would not mean such decisions have the requisite finality to be appealable as of right. It is true that "[s]ome trial court rulings that do not conclude the litigation nonetheless are sufficiently conclusive in other respects that they satisfy the finality requirement of our jurisdictional statute."[42] This proposition implicates the "collateral order doctrine" enunciated by the Supreme Court in *Cohen v. Beneficial Industrial Loan Corporation*[43] and its judicial progeny. But the requirements of the collateral order doctrine are meant to

---

[42] *Rolinski*, 828 A.2d at 746.

[43] 337 U.S. 541, 546 (1949).

be quite "stringent,"[44] and no party or *amicus* in this case has even tried to argue that goal change orders meet them. The majority opinion does not make that argument either, though it implicitly relies on *Cohen*.[45]

The collateral order doctrine applies only to a "small class" of orders: those that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."[46] To come within the doctrine, an order therefore must satisfy three conditions: It "must (1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and

---

[44] *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994).

[45] *District of Columbia v. Tschudin*, the case cited by the majority, *ante* at 24, applied *Cohen*'s rationale to hold that an order may be regarded as final and appealable if nothing more than a ministerial act (e.g., execution of the judgment) remains to be done to terminate the proceedings in the trial court. 390 A.2d 986, 988-89 (D.C. 1978). This holding is inapplicable to the present case; far more than a mere ministerial act must occur in the aftermath of a change in the permanency goal before the neglect, TPR, and adoption proceedings are concluded.

[46] *Cohen*, 337 U.S. at 546; *see also, e.g., Will v. Hallock*, 546 U.S. 345, 349-50 (2006); *Rolinski*, 828 A.2d at 746.

(3) be effectively unreviewable on appeal from a final judgment."[47]   These conditions are strictly construed to prevent the collateral order doctrine from subverting the important policies promoted by the final judgment rule.[48]   The Supreme Court thus has explained that a "further characteristic that merits appealability under *Cohen*" also must be present, and "that something further boils down to 'a judgment about the value of the interests that would be lost through rigorous application of a final judgment requirement.'"[49]   Accordingly, the "effective unreviewability" requirement is met only when "some particular value of a high order," typically "a substantial public interest," will be imperiled by the denial of an immediate, interlocutory appeal.[50]

Orders changing a neglected child's permanency goal from reunification to adoption do not satisfy any of the three preconditions for invocation of the

---

[47] *Rolinski*, 828 A.2d at 747 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)) (brackets omitted).

[48] *See Will*, 546 U.S. at 349-50.   We discuss these policies in the next section of this Part.

[49] *Id.* at 351-52 (citations omitted).

[50] *Id.* at 352-53.   "Otherwise, almost every pretrial or trial order might be called 'effectively unreviewable' in the sense that relief from error can never extend to rewriting history."   *Id.* at 351 (internal quotation marks omitted).

collateral order doctrine. First, such orders do not "conclusively determine" the "disputed questions" of reunification and adoption (or any other contested issues, for that matter). Second, the principal issue the orders *tentatively* "resolve" is merely whether the government should move to terminate parental rights and pursue an adoptive placement. This "resolution" resolves nothing – it is only a prelude to further litigation of the TPR and adoption issues – and it is intertwined with, not "completely separate from," the merits of the action. As for the third condition, we have seen that permanency goal changes to adoption do not jeopardize sufficiently substantial interests of the biological parents. If further proceedings do eventuate in TPR and adoption orders, "effective" review is available on appeal from the final judgment; in the past, this court has granted meaningful relief in cases where the record showed that a biological parent was denied a fair opportunity to achieve reunification.[51]

Orders that merely change the permanency goal to adoption are not equivalent to, and should not be confused with, other interim orders that actually do conclusively deny important legal rights of biological parents for reasons

---

[51] *See, e.g.*, *In re C.T.*, 724 A.2d 590, 599 (D.C. 1999) (reversing TPR determination where there was evidence that father "might be on the road to becoming a fit parent").

separate from the merits of any future TPR and adoption determinations. This court has held that an order permanently or indefinitely prohibiting a biological parent from visiting his or her neglected child may fall within that category and be appealable as a final order.[52] Conceivably, an order denying a biological parent's claim of statutory entitlement to reasonable reunification services similarly might be conclusive, important, and separate enough in a particular case to satisfy the collateral order doctrine. But orders such as these should not be confused with orders that merely approve a change in the permanency plan for a neglected child and direct the District to either file a TPR motion or seek to be joined as a party to a filed adoption petition.[53] It is instructive to compare goal changes with other interim orders in neglect proceedings that we have held not to be appealable by the biological parents even though the orders can have prolonged and dramatic adverse consequences for the likelihood of reunification: (1) an order removing a child from her parent's physical custody and placing the child in shelter care pending the adjudication of the government's allegations of neglect,[54] and (2) an order prohibiting a parent facing criminal charges from even seeing his children until the

_____

[52] *In re D.M.*, 771 A.2d 360, 365 (D.C. 2001).

[53] *See* D.C. Code § 16-2323 (c)(2).

[54] *In re S.J.*, 632 A.2d 112 (D.C. 1993).

criminal charges are finally resolved.[55] If orders such as these do not satisfy the requirements of finality for purposes of our appellate jurisdiction, it is difficult to see how orders merely changing a child's permanency goal could be thought to do so.

In support of its holding, the majority states that "[t]he District of Columbia is among the few remaining jurisdictions that do not permit appeals of permanency goal changes from reunification to adoption in neglect proceedings," and that *In re K.M.T.* "departed from the norm," inasmuch as "a vast majority of jurisdictions allow appellate review of goal changes either as appeals as of right or [discretionary] interlocutory appeals." *Ante* at 23. These statements are materially inaccurate.

First, *In re K.M.T.* did not even consider the availability of discretionary interlocutory appeals of goal changes – an entirely different question from whether goal changes are final and hence immediately appealable as of right. But our

_____

[55] *In re M.F.*, 55 A.3d 373, 379 (D.C. 2012).

decision in another case, *In re J.A.P.*,[56] indicates that discretionary interlocutory appeals from goal change decisions are *permitted* in this jurisdiction pursuant to D.C. Code § 11-721 (d).[57] Thus, if the majority's count is accurate, *see ante* at 23 n.16, the District appears to join at least twenty-six states that allow for discretionary interlocutory review of changes in the permanency goal from reunification to adoption – hardly a "departure from the norm."

Second, far from being an outlier, *In re K.M.T.*'s holding that a goal change from reunification to adoption is not a final order appealable as of right is solidly in the mainstream. A substantial majority of jurisdictions – two-thirds of the states, according to the survey on which the majority relies – do *not* permit appeals of

_____

[56] 749 A.2d 715 (D.C. 2000).

[57] *See id.* at 716, 719 (considering application for allowance of interlocutory appeal by the birth mother in a contested adoption proceeding). D.C. Code § 11-721 (d) provides for the availability of discretionary appeals of certain non-final rulings and orders in civil cases "other than a case in which a child, as defined in section 16-2301, is alleged to be delinquent, neglected, or in need of supervision." This exclusion does not extend to cases in which the child is no longer merely "alleged" to be neglected because neglect already has been adjudicated. The neglect statute draws that distinction—when it speaks of proceedings prior to the adjudication, it refers to a "child alleged to be neglected" and "allegations" of neglect, but when it speaks of subsequent proceedings (including permanency hearings), it refers to "a child [who] is found to be neglected" or "a child [who] has been adjudicated neglected." *See, e.g.*, D.C. Code §§ 16-2316.01, -2317, -2320, -2323 (2012 Repl.).

goal changes as of right.[58]  Moreover, because of differences in the statutory language from jurisdiction to jurisdiction, the fact that a handful of states do permit appeals of goal changes as of right holds little significance for us.  For example, the reason the Court of Appeals of Maryland held that changes in the permanency plan from reunification to adoption are appealable was not because such changes are final orders, but because Maryland has a specific statutory exception to the

_____

[58] *See, e.g.*, *R.N. v. Dep't of Children & Families*, 113 So. 3d 1034, 1034 (Fla. Dist. Ct. App. 2013) (holding that an order changing the permanency goal to adoption is not an appealable final order); *In re Curtis B.*, 784 N.E.2d 219, 223 (Ill. 2002) (stating that because "all of the rights and obligations set forth in the permanency order must remain open for reexamination and possible revision until the permanency goal is achieved[,] . . . there is no reasonable basis upon which we can determine that a permanency order is [appealable as] a final order"); *In re T.R.*, 705 N.W.2d 6, 9-11 (Iowa 2005) (holding that a permanency order changing custody and directing the filing of a TPR petition is not "a final appealable order"); *In re Chubb*, 773 P.2d 851, 854 (Wash. 1989) (en banc) (holding that "dependency review orders are not final" and hence are not appealable as of right); *In re H.R.*, 883 P.2d 619, 621 (Colo. App. 1994) ("[T]he permanency plan adopted here did not constitute a final and appealable order because it did not effectuate any change in permanent custody or guardianship or terminate parental rights."); *In re K.F.*, 797 N.E.2d 310, 314-15 (Ind. Ct. App. 2003) (holding that a permanency plan order is not final, and hence not appealable, because "[t]he only way in which the permanency plan affects the [parents] is that it approves the initiation of proceedings which could result in the termination of their parental rights.  Such proceedings will not prejudice the [parents] unless and until termination occurs.") (emphasis omitted); *In re L.E.C.*, 94 S.W.3d 420, 425 (Mo. Ct. App. 2003) ("It is clear that a change in the 'permanency plan' [from reunification to adoption] is not in itself a final adjudication.  It is, as the name implies, a 'plan,' not a result, although certain changes are implemented in connection with the plan.  The jurisdiction of the Circuit Court continues, however, and is one of ongoing management. Accordingly, we do not consider the ruling a final judgment[.]").

final judgment rule permitting such appeals.[59]  Similarly, goal change orders are appealable as of right in Massachusetts, Louisiana, Oklahoma, and Oregon not because the orders are deemed final, but because specific statutory provisions in those states allow them to be appealed anyway.[60]  The statutory exceptions in these states have no counterpart in the law of the District of Columbia.

## C.  Permitting Interlocutory Appeals of Permanency Plan Orders Will Disserve the Policies of the Final Judgment Rule By Threatening to Prolong the Retention of Children in Foster Care.

The requirement that a trial court proceeding be concluded in its entirety before an appeal may be taken serves several important public policies.  Most pertinently, those policies include preventing "the unnecessary delays resultant from piecemeal appeals" and "the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise."[61]  These

---

[59]  *See In re Damon M.*, 765 A.2d 624, 626-28 (Md. 2001) (relying on Md. Code, Cts. & Jud. Proc. § 12-303 (3)(x) (1998 Repl.)).

[60]  *See* Mass. Gen. Laws ch. 119, § 29B (e) (2012); La. Child. Code art. 710 (D) (2015); Okla. Stat. tit. 10A, § 1-5-101 (2009); Or. Rev. Stat. § 419B.476 (8) (2015).

[61]  *Rolinski*, 828 A.2d at 745 & n.8 (internal quotation marks and citations omitted).  Other policies served by the final judgment rule include refraining from the unnecessary decision of issues that may be mooted by the final judgment, respecting the role and independence of the trial judge, and fostering efficient

(. . . continued)

policies are of utmost importance in proceedings intended to end prolonged stays in foster care and achieve permanent, stable homes for abused and neglected children. As *amicus curiae* Children's Law Center warns, permitting interlocutory appeals as of right from permanency plan orders will cause substantial delays in the overall permanency process – delays that the neglect statute was specifically written to prevent, and that will cause real harm not only to the very children the process is designed to protect, but also to biological parents and to prospective adoptive parents.

---

(….continued)

judicial administration. *Id.* These policies too will be disserved by the allowance of interlocutory appeals of goal changes. For example, issues regarding the permanency goal change may be rendered moot by a change in the goal back to reunification or by a final adjudication of a TPR motion and any adoption petition. *See In re Karl H.*, 906 A.2d 898, 902-03 (Md. 2006); *accord, In re Jayden G.*, 70 A.3d 276, 288, 292 (Md. 2013) (rejecting argument that proceedings to terminate a parent's rights must be stayed when the parent appeals a change in the permanency plan, even though "without a stay of TPR proceedings, the outcome of the parent's appeal of a change in the permanency plan may be rendered moot"); *see also Settlemire v. District of Columbia Office of Employee Appeals*, 898 A.2d 902, 904-05 (D.C. 2006) ("In general, when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome, a case is moot. Accordingly, it is well-settled that, while an appeal is pending, an event that renders relief impossible or unnecessary also renders that appeal moot.") (internal citations and quotation marks omitted).

Permitting interlocutory appeals of goal changes is sure to add substantial delay to an already protracted process. These appeals will have to go from the magistrate judge to an associate judge of the Superior Court for a ruling before the order then can be appealed to this court.[62] It is wishful thinking to suppose that all these appeals will be disposed of quickly. Consider the following:

> In the experience of amicus curiae Children's Law Center, which handles approximately one third of all abuse and neglect cases in D.C., over the past two years the average time from the date of a magistrate judge order to an associate judge order is 103 days—ranging from 54 days to 226 days. During the same two-year period (April 1, 2012 to April 1, 2014), the average time from the date of filing a notice of appeal from the associate judge order to obtaining a decision from [the Court of Appeals] is 511 days—ranging from 356 days to 741 days. In other words, the total time for the appeal process from the initial trial court decision to [the Court of Appeals] ruling in our cases over the past two years has averaged 614 days. While those neglect, termination of parental rights, adoption, and custody appeals may involve more issues than the average permanency goal

---

[62] *See* D.C. Fam. Ct. R. D (f) ("An appeal to the District of Columbia Court of Appeals may be made only after an associate judge of the Superior Court has reviewed the magistrate judge's order or judgment pursuant to paragraph (e) of this rule."); D.C. Code § 11-1732 (k) (2012 Repl.) ("An appeal to the District of Columbia Court of Appeals may be made only after a judge of the Superior Court has reviewed the order or judgment."); *id.* at § 11-1732A (d) (2012 Repl.).

> change appeal, these are all matters that the courts are currently handling on an expedited timeline.[63]

-+

This court knows all too well how accurate this portrayal is.

Rather than engage with such informative data, the majority opinion minimizes the concern that overruling *In re K.M.T.* will mean lengthy interlocutory appeals in a large number of neglect cases. The opinion hopefully states that "[b]ecause of the limited scope of this court's review, and the broad discretion enjoyed by trial courts in making permanency goal decisions, we are confident that in the vast majority of cases our review can be adequately addressed using our summary appeals process." *Ante* at 37. Of course, in predicting that our review will be so limited and deferential to the trial court that the vast majority of appeals from permanency goal changes will be resolved summarily, the majority implicitly admits what it has taken pains to deny – that such appeals will provide few if any benefits to parents (unless they view disruption and delay of the permanency process as benefits, which is hardly to be encouraged). But while we too expect

_____

[63] Br. of *Amicus Curiae* Children's Law Center at 3-4 (footnote omitted).

that the costs of the decision to permit interlocutory appeals of permanency goal changes will greatly outweigh the minimal potential benefits, we think the majority's optimism regarding the speed of appellate review is unconvincing for several reasons.

First, as even two members of the majority are compelled to acknowledge, before an appeal even reaches this court, it must complete the time-consuming intermediate appeal within the Superior Court, from magistrate judge to associate judge.[64] Second, the necessary steps of appellate litigation, such as obtaining and reviewing the record and transcript, briefing, judicial consideration, and opinion-writing, are time-consuming, and even if our summary appeals process is completed in months rather than years, that is still an undesirable prolongation of the time a fragile child remains in foster care.

Third, the majority disregards the potentially transformative consequences of its holding that the government must "produce sufficient evidence" at a "formal

_____

[64] *See post* at 138 n.1 ("Streamlining review procedures in this court will not, however, minimize the time it takes to litigate these matters in Superior Court. . . . *[I]t may take years before a notice of appeal is filed transferring jurisdiction to this court.*") (emphasis added).

hearing" to rebut a "presumption in favor of reunification" by a preponderance of the evidence in order to secure a change in the permanency plan from reunification to adoption. *Ante* at 30-31. This holding will narrow considerably the "broad discretion enjoyed by trial courts in making permanency goal decisions" that the majority counts on to ensure swift appellate review.[65] *Ante* at 37.

Fourth, the majority also overlooks the range of issues that can and predictably will arise in contested goal change hearings. Potential appellate issues include challenges for abuse of discretion and insufficiency of the evidence (which the majority's burden of proof holding will encourage), questions regarding the admission or exclusion of expert medical and psychiatric testimony and other

---

[65] In principle, we do not quarrel with the proposition that parents have a right to an evidentiary hearing at which they may cross-examine adverse witnesses and present their own evidence if they wish to contest the material factual allegations supporting the CFSA's decision to seek a goal change. Parents have that right. *See* Super. Ct. Neg. R. 28 (a), (d); *see also* Super. Ct. Neg. R. 30 (a), 32 (e). Nor do we quarrel with putting the burden on the government to establish that a change in the permanency plan from reunification to adoption is in the child's best interests. This is the general rule. *See, e.g.*, *In re Nazier B.*, 947 N.Y.S.2d 157, 158 (App. Div. 2012). On the other hand, courts in other jurisdictions have held that the rules of evidence are relaxed at permanency hearings. *See, e.g.*, *In re Ashley E.*, 874 A.2d 998, 1018 & 1018 n.19 (Md. 2005). The majority's insistence on a "formal" adjudicatory hearing strikes us as excessive, and as imposing an unnecessary burden on the trial court and the other parties in cases in which the biological parents do not dispute the material facts.

evidence pertaining to the parents and their children, and substantive issues of all kinds (limited only by the ingenuity of counsel) relating to the reasonableness of plans and efforts to preserve and reunite the family, the parents' compliance and progress, the best interests of the children, and other pertinent matters.

Fifth, the majority disregards the complications and delay that will ensue simply from the fact that there will be multiple parties in these appeals – at a minimum, the neglected child and the District – who undoubtedly will participate in the briefing and argument at every stage.

Interlocutory appeals do "not operate to stay" the order appealed from.[66] We presume this means that the Superior Court will have concurrent jurisdiction over the case during the pendency of an appeal of an order changing the permanency goal from reunification to adoption. Perhaps the disruption and delay caused by these appeals can be mitigated by the exercise of such concurrent jurisdiction. Nonetheless, we cannot put too much faith in that possibility, for the reality is that trial judges and litigants eyeing the possible reversal of goal change orders on

_____

[66] D.C. Code § 16-2329 (d) (2012 Repl.).

appeal may be understandably reluctant to move forward with the challenged goal changes or with hearings on TPR and adoption petitions until the appeals are concluded. The Children's Law Center advises that, in its experience, "judges have declined to hold further hearings that are allowed under concurrent jurisdiction, due to the pendency of appeals."[67]

The alarming prospect of adding years of interlocutory appellate delay to the process of providing permanent homes for neglected and abused children in the District of Columbia should dissuade this court from relaxing the requirements of the collateral order doctrine to permit appeals of permanency goal changes. Such additional delay will frustrate the "strong public policy, enhanced by federal legislation, disfavoring the protracted retention of children in foster care"[68] and will threaten dire harm to the children who are most at risk.

The District's neglect statute provides for permanency planning and permanency hearings to fulfill the requirements set forth by Congress in the

---

[67] Br. of *Amicus Curiae* Children's Law Center at 11.

[68] *In re J.G.*, 831 A.2d 992, 1001 (D.C. 2003) (footnote omitted).

Adoption and Safe Families Act ("ASFA").[69]   The stated aim of those requirements is to prevent "unnecessarily prolonged stays in foster care" and achieve "early permanent placements" of neglected and abused children in stable homes.[70]  As the Supreme Court has said, "protracted stays in [foster] care . . . may deprive [neglected] children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens.'"[71] "Legislatures and courts alike have recognized that, in the words of one commentary, 'no child can grow emotionally while in limbo.  He cannot invest except in a minimal way . . . if tomorrow the relationship may be severed."[72]  The goal of permanency planning is to "end the uncertainty of foster care and allow the dependent child to form a long-lasting emotional attachment to a permanent

---

[69]   Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115 (codified as amended in scattered sections of 42 U.S.C.).

[70]   H.R. Rep. No. 105-77, at 13 (1997), *reprinted in* 1997 U.S.C.C.A.N. 2739, 2745-46.

[71]   *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 835 n.37 (1977).

[72]   *In re L.L.*, 653 A.2d 873, 887 (D.C. 1995) (quoting Michael Wald, *State Intervention on Behalf of "Neglected" Children:  A Search for Realistic Standards*, 27 Stan. L. Rev. 985, 995 (1975)); *In re An.C.*, 722 A.2d 36, 41 (D.C. 1998) (quoting same).

caretaker."[73]  Time is of the essence, for the years in foster care constitute "an enormous span in the lifetime of a child"[74]—a critical, uniquely sensitive period in the child's growth.[75]  Thus, "[t]here comes a time, sooner for younger children than for older children, when a permanent decision is more important than waiting for a potentially better option to be in place.  Permanency planning is recognizing the need for a final decision to be made consistently with the child's developmental needs and sense of time."[76]  Until now, this court has appreciated that "*[t]imely integration into a stable and permanent home is arguably the most important factor when considering the best interests of the child.*"[77]

---

[73]  *In re L.L.*, 653 A.2d at 888 (internal quotation marks and citations omitted).

[74]  *In re A.B.E.*, 564 A.2d 751, 758 (D.C. 1989); *see also In re C.T.*, 724 A.2d 590, 599 (D.C. 1999) (observing that "two and a half years [is] . . . an enormous span in the life of a young child").

[75]  *See* 2 Ann M. Haralambie, *Handling Child Custody, Abuse and Adoption Cases* § 12:36 at 403 (3d ed. 2009) ("The child's sense of time is very different than an adult's, and there is a great deal which must be accomplished during the few short years of childhood.  Lost time and lost opportunities can never be regained.  Children who do not experience a secure bonded relationship during childhood may have difficulty in forming relationships for the rest of their lives.  Every change of placement makes it more difficult for the child to form another attachment.") (footnote omitted).

[76]  *Id.*

[77]  *In re D.H.*, 917 A.2d 112, 118 (D.C. 2007) (emphasis added); *see* D.C.

(. . . continued)

The majority discounts the concern about appellate delay as merely one about "marginally greater efficiency in moving children to permanency." *Ante* at 22. We think this statement gravely underestimates the stakes for these children and fails to respect the public policy determinations made by Congress when it enacted ASFA and the Council in enacting our neglect statute.

The majority is concerned that deferring appellate review of a change in the permanency goal to adoption is prejudicial to biological parents because it allows the children time to develop attachments to their foster parents while proceedings continue. *See ante* at 22. But the way to address this concern is to require prompt TPR and adoption hearings following the goal change, as the statute contemplates, not to permit interlocutory appeals. The delays caused by interlocutory appeals of goal change decisions will only exacerbate the problem that the majority perceives by lengthening the time children remain in foster care before permanency is achieved. This is so even when the biological parents *succeed* in reversing the goal

---

(….continued)
Code § 16-2353 (b)(1) (2012 Repl.).

change on appeal, because that merely will return the goal to reunification; it will not be a determination that the biological parents have met that goal and are entitled to regain custody of their children from the foster parents.[78]

In sum, for the preceding reasons, we would hold that permanency goal changes from reunification to adoption are not final orders appealable as of right. We respectfully dissent from the decision to overrule *In re K.M.T.*[79]

_____

[78] *Cf. Santosky v. Kramer*, 455 U.S. 745, 765-66 (1982) ("For the child, the likely consequence of an erroneous failure to terminate is preservation of an uneasy status quo."). What does serve to alleviate the majority's concern is that the neglect statute already provides a remedy for biological parents who believe foster care is no longer necessary and are seeking a final order reunifying them with their children and terminating the neglect case: they may petition the court to modify the dispositional order accordingly. *See* D.C. Code § 16-2323 (h)(1). If the court finds that the child's commitment to foster care or other protective custody is no longer necessary or appropriate to safeguard the child's welfare, it may order the child returned to the home. D.C. Code § 16-2323 (f)(1). We assume that the denial of a petition for such conclusive relief would constitute a final, appealable order. *Cf. In re L.L.*, 653 A.2d at 875 (permitting appeal from the denial of a TPR motion). Thus, parents who believe they are fit and entitled to reunification have every incentive to move for a hearing if they think they are being prejudiced by delay, and to do so as soon as feasible.

[79] Before we leave this topic, we should call attention to the uncertain scope of the majority's overruling of *In re K.M.T.* The majority's explicit holding is that "a change of the presumptive goal of a neglect proceeding from reunification to adoption is an appealable final order." *Ante* at 54. This leaves some related questions yet to be resolved. Notably, at times the majority implicitly suggests that

(. . . continued)

**III. The Constitution Does Not Require Proof of Parental Unfitness Before a Court May Terminate Parental Rights When Necessary to Protect a Child From Serious Harm.**

Our colleagues assert that the substantive due process right of an individual to continue or resume parenting her abused or neglected child may not be terminated without a predicate finding by clear and convincing evidence that the individual is unfit to parent. We agree that this is ordinarily true, but our agreement comes with the critical caveat that the best interest of the child is the paramount and overriding consideration in the decision. As we held in *In re S.L.G.*, there is a "presumption in favor of the natural parent in a TPR or contested

---

(….continued)

an appeal also may be permissible if there is a shift to concurrent goals, where planning for adoption will be concurrent with, but will not supplant, planning for reunification. *See ante* at 33, 36 n.28. This implication is puzzling, though, because the reasons on which the majority relies to support its holding – the CFSA's supposed withdrawal of support for, and abandonment of, the biological parents – do not apply when the CFSA chooses to pursue concurrent goals. Moreover, the CFSA is permitted at all times to pursue simultaneous efforts to reunify and to place the child for adoption, and it does not need court approval to do so.

Beyond this, it also is unclear whether a parent could later appeal from a refusal to change a goal of adoption back to a goal of reunification. It is similarly unclear whether a neglected child or any other party (the District? an adoption petitioner?) could appeal a permanency goal order – including, for example, an order refusing to change a goal *from* reunification *to* adoption (or another placement), or one setting reunification as the goal. And the majority likewise does not address the appealability of an initial order setting adoption as the goal.

adoption proceeding" that is "rebutted only by a showing [either] that the parent is . . . unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest."[80]  Our colleagues, however, insist that a finding of unfitness is a virtually absolute, "essential" constitutional requirement that must *always* be made before the child's best interest may be taken into account.  *Ante* at 38, 54; *post* at 138-39, 142, 149-151, 156-158.  In effect, the opinions of our colleagues treat the interest of the parent rather than that of the child as the paramount concern, and would substitute the criterion of parental fitness for the best interest of the child; indeed, one of the opinions declares that the en banc decision in this case "overrule[s] prior pronouncements that proof of unfitness is not constitutionally required to permanently sever an existing parent-child relationship—that all that is needed is a showing that termination is in the best interests of the child."  *Post* at 142.  To be sure, our colleagues "acknowledge that there *may* be circumstances in which clear and convincing evidence will show that an award of custody to a fit natural parent would be detrimental to the best interests of the child," and hence that "there *might* be truly exceptional

---

[80]  *In re S.L.G.*, 110 A.3d 1275, 1286 (D.C. 2015) (internal quotation marks and footnote omitted); *see also Troxel v. Granville*, 530 U.S. 57, 68-69 (2000) (plurality opinion) ("[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will *normally* be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children") (emphasis added).

circumstances where termination is permissible notwithstanding a parent's fitness."

*Ante* at 43, *post* at 142-43 n.6 (emphases added, internal quotation marks omitted).

Thus our colleagues ultimately do adhere to what we said on the subject in *In re*

*S.L.G.*[81]  Yet they proceed to dismiss this qualification as unrealistic and merely

theoretical.  *See ante* at 43, *post* at 142-43 n.6.  At least three judges in the majority

appear ready to jettison entirely the principle enshrined in our jurisprudence that

the child's health and welfare is the decisive consideration in parental termination

cases.  *See, e.g.*, *post* at 139-40 n.4, 146 n.7, 147 n.12.

We fundamentally disagree with our colleagues' constitutional analysis and

resulting elevation of parental rights over the best interest of the child in TPR and

contested adoption proceedings.  The right to parent one's child is not a right to

harm one's child.  Decades of precedent from this court, the dictates of logic, and

guidance from the Supreme Court, Congress, and other courts all weigh against the

position our colleagues espouse.  Their constitutional pronouncement is based on a

misreading of the Supreme Court's decisions in *Stanley v. Illinois*[82] and *Santosky v.*

---

[81]  For this reason, we consider it inaccurate to say that prior cases are overruled.  *Post* at 142.  *In re S.L.G.* remains binding precedent in this jurisdiction.

[82]  405 U.S. 645 (1972).

*Kramer*[83] that this court long ago considered and rejected and that the Supreme Court itself has made clear was not what those cases held. Our colleagues' position also is based on their reluctance to face an oft-demonstrated fact – that in some infrequent but recurring circumstances, termination of the biological parents' rights is indeed necessary to protect the child they neglected or abused from serious and irreparable harm even though the parents belatedly may have rehabilitated themselves and become otherwise "fit."[84]

---

[83] 455 U.S. 745 (1982).

[84] It might be thought that our colleagues' fitness criterion could be reconciled with our traditional best-interest-of-the-child jurisprudence if they would agree that even a fully rehabilitated parent should not be deemed "fit" to parent a particular child when returning that particular child to the parent would be detrimental to the child's welfare, whatever the reason. This would be to say that parental "fitness" should be defined as coextensive with the child's best interests. As a practical matter, such a definitional fix might meet our principal objection to the elevation of parental entitlements over the well-being of children. But at least some of our colleagues appear to resist this approach, *see post* at 139-40 n.4, even though we all agree that, broadly speaking, "fitness refers to the parent's intention and ability over time to provide for a child's wellbeing and meet the child's needs." *In re S.L.G.*, 110 A.3d at 1286. *See ante* at 41, *post* at 152. The lack of a more specific definition of parental fitness is unfortunate. In any event, however the presently somewhat nebulous term "fitness" is defined, our position is that in child neglect, TPR and adoption proceedings, "as in all proceedings affecting the future of a minor, the decisive consideration is [and should be] the best interests of the child." *In re S.C.M.*, 653 A.2d 398, 405 (D.C. 1995).

Preliminarily, to reemphasize a point made earlier, whether a court constitutionally may terminate a parent's rights without finding the parent "unfit" is not a question we should be addressing in this case. Because the parents here waived the issue, it has no impact on the court's resolution of the present appeals. Moreover, the issue has long been settled by a generation of this court's past decisions, and the parties and *amici* in this case (including the institutional litigants who have a strong interest in the matter) have not been afforded an opportunity to be heard on the question. For all these reasons, it strikes us as highly inappropriate for the majority to reach out *sua sponte* and, as some members of the majority would have it, "overrule" those decisions in this case. *Post* at 142. Our main objection, however, is a substantive one.

Our colleagues undermine, if they do not actually reject, what we take to be a principle of overriding importance, namely, that the child's best interest is the paramount consideration in parental termination and contested adoption proceedings. It is a corollary of this principle that a court may and should terminate parental rights without a predicate finding of parental unfitness if the court finds by clear and convincing evidence that it is necessary to do so to protect the child's wellbeing. As we shall discuss, there indeed are "realistic factual

situation[s]," *ante* at 42, in which a neglected child would be harmed if returned to her fit biological parents. In case after case, this and other courts have been confronted with such situations and resolved them in favor of protecting the child from actual harm.

To contextualize the question, let us think of children like those before us in the present appeals – at-risk children who would be psychologically devastated if they were permanently removed from the only safe and loving home they have ever known, that of the foster parents who have cared for them, restored them to health, and seek to adopt them. In affirming the trial court's decision in this case, most of our colleagues recognize that the danger of irreparable psychological harm to the children outweighs the biological parents' preference that they be placed with an otherwise fit alternative caregiver. That being so, it is hard for us to understand why our colleagues refuse to acknowledge that the same grave danger of irreparable harm would exist if the question were whether to return these or similar at-risk children to the custody of their (hypothetically) fit biological parents.

## A. The Child's Best Interest Is the Paramount Consideration in Termination Proceedings.

For decades, and until now, this court's considered answer to the question we face has been this:

> [A] termination proceeding involves more than a parent's fundamental liberty interest in the care, custody, and control of his child. The child's interests in stability, safety, security, and a normal family home are also at stake, as well as the prompt finality that protects those interests. So, even though we are evaluating whether a parent's rights were violated, in matters affecting the future of a minor child, the best interest of the child is the decisive consideration. *Parental rights are not absolute, and must give way before the child's best interests. The legal touchstone in any proceeding to terminate parental rights is the best interest of the child, and that interest is controlling.*[85]

Accordingly, this court has "repeatedly emphasized that it is the child's best interest, not the fundamental right to parent, that is paramount in [TPR and]

---

[85] *In re R.E.S.*, 19 A.3d 785, 789 (D.C. 2011) (emphasis added; internal citations and punctuation omitted).

adoption cases,"[86] and therefore that "a finding of parental unfitness is not a constitutional prerequisite" to the termination of parental rights when the child's welfare is at stake.[87] Courts in other jurisdictions have been of the same mind.[88]

This position aligns with Congress's declaration that ASFA "establishe[d] explicitly for the first time in Federal law that a child's health and safety must be the paramount consideration when any decision is made regarding a child in the

_____

[86] *In re C.A.B.*, 4 A.3d 890, 899 (D.C. 2010).

[87] *In re Baby Boy C.*, 630 A.2d 670, 682 (D.C. 1993); *see, e.g.*, *In re S.M.*, 985 A.2d 413, 416-17 (D.C. 2009) ("[T]he paramount consideration is the best interest of the child. . . . The presumption [in favor of a fit natural parent] must necessarily give way in the face of clear and convincing evidence that requires the court, in the best interest of the child, to deny custody to the natural parent in favor of an adoptive parent."); *In re J.G.*, 831 A.2d 992, 1001 (D.C. 2003) ("Notwithstanding the presumption in favor of the birth parent, . . . we have repeatedly held that the parent's rights may and must be overridden when such a drastic measure is necessary in order to protect the best interests of the child.").

[88] *E.g., In re J.C.*, 608 A.2d 1312, 1316 (N.J. 1992) ("[T]he cornerstone of the inquiry is not whether the biological parents are fit but whether they can cease causing their child harm."); *In re Colby E.*, 669 A.2d 151, 152 (Me. 1995) ("The State is not required to prove that the parent is the cause of the child's jeopardy, or that the parent is generally unfit. The inquiry is whether the parent can protect the child from those circumstances that either will cause or threaten serious harm."); *see also, e.g., In re Ann S.*, 202 P.3d 1089, 1101-03 (Cal. 2009); *A.D.B.H. v. Houston Cty. Dep't of Human Res.*, 1 So. 3d 53, 61 (Ala. Civ. App. 2008); *In re Rashawn H.*, 937 A.2d 177, 189-90 (Md. 2007); *Opinion of the Justices to the Senate*, 691 N.E.2d 911, 914 (Mass. 1998).

Nation's child welfare system."[89]   Congress took much the same position in the Indian Child Welfare Act of 1978[90] in establishing "minimum federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes."[91]   The Act provides for the termination of parental rights based not on a showing of parental unfitness, but rather on "evidence . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[92]   This is a best-interest-of-the-child standard.[93]   In 2013, when the Supreme Court examined this provision in *Adoptive Couple v. Baby Girl*,[94] there was no indication that any Justice thought it vulnerable to a substantive due process challenge for its failure to require a finding of parental unfitness.   Contrariwise, Justice Sotomayor's dissent, which three other Justices joined, evinced agreement with our understanding that a

---

[89]   Strengthening Abuse  and  Neglect Courts Act of 2000, Pub. L. No. 106-314, § 2 (2), 114 Stat. 1266 (2000), 42 U.S.C. § 670 note (2015).

[90]   25 U.S.C. §§ 1901-1963 (2012).

[91]   *Id.* § 1902.

[92]   *Id.* § 1912 (f).

[93]   *See In re Mahaney v. Mahaney*, 51 P.3d 776, 784-85 (Wash. 2002); *A.B.M. v. M.H.*, 651 P.2d 1170, 1175-76 (Alaska 1982).

[94]   133 S. Ct. 2552 (2013).

finding of unfitness is not always required to terminate parental rights because the child's best interest is paramount. "Of course," Justice Sotomayor wrote, "it will *often* be the case that custody is subsequently granted to a child's fit parent, consistent with the presumption that a natural parent will act in the best interests of his child."[95]

The Supreme Court likewise has "emphasized the paramount interest in the welfare of children and has noted that the rights of the parents are a counterpart of the responsibilities they have assumed."[96] In *Quilloin v. Walcott*, its only case directly on point, the Court expressly held that the best interest of the child is, at least in some circumstances, a constitutionally *permissible* basis for terminating a biological parent's rights without a finding of unfitness and for approving an

---

[95] *Id.* at 2583 n.14 (Sotomayor, J., dissenting) (emphasis added). Our dissenting colleagues appear to misunderstand our point in citing *Adoptive Couple v. Baby Girl* and the Indian Child Welfare Act. *See post* at 159-50 n.15. It is true that the Act requires termination orders to be supported by "evidence beyond a reasonable doubt," 25 U.S.C. § 1912 (f), a more demanding standard than clear and convincing evidence. Our point is that *even under a statute incorporating this heightened standard*, the Justices joining Justice Sotomayor's dissent understood that a *fit* biological parent's rights may be terminated for the child's welfare.

[96] *Lehr v. Robertson*, 463 U.S. 248, 257 (1983).

adoption by an existing non-relative caregiver whom the parent opposed.[97]  As in this case and other cases we now are discussing, the child's interest at stake in *Quilloin* was in maintaining his existing familial relationship with the non-relative caregiver.[98]

It may well be, as the Court said in dictum, that "some showing of unfitness" would be required before the state could "force the breakup" of a natural family unit "over the objections of the parents and their children . . . for the sole reason that to do so was thought to be in the children's best interest."[99]  But that normative proposition did not apply to *Quilloin* and it is a *non sequitur* here.  The present case and the other cases we are talking about are ones in which (1) the natural parents *do not* have an unbroken custodial relationship with the child – the child

_____

[97]  434 U.S. 246, 255 (1978).

[98]  *See In re P.G.*, 452 A.2d 1183, 1184-85 (D.C. 1982) (explaining that in *Quilloin*, the Supreme Court "found that a best interest [of the child] standard satisfied the due process rights of the nonconsenting parent . . . where the effect is simply to recognize an existing family unit," but "declined to address whether the best interest standard would always suffice, i.e., even where the child has not already been integrated into the adoptive family for some time").

[99]  *Quilloin*, 434 U.S. at 255 (quoting *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 862-63 (1977) (Stewart, J., concurring)).

had to be removed from their home and placed in foster care[100]; (2) the child's

removal and placement in foster care *was* based on "some showing of unfitness"

(namely, the showing of abuse or neglect and a demonstrated risk to the child's

safety); (3) the reason for terminating parental rights is *not* "solely" the child's best

interest, but rather and more specifically the compelling need to protect the child

from demonstrated harm of great magnitude; and (4) the abused or neglected child

typically does *not* "object" to the "breakup of the family" – rather, the child or her

guardian *ad litem* typically *favors* the proposed TPR and adoption.

Contrary to our colleagues' contentions, *see ante* at 38-39, *post* at 145-50,

neither *Stanley v. Illinois*[101] nor *Santosky v. Kramer*[102] established that the

Constitution demands a finding of parental unfitness before a court may terminate

a biological parent's rights in the best interest of the child. Those two cases

concerned the requirements of procedural due process, not substantive due process.

Accordingly, in *In re P.G.*, this court squarely rejected the contention that "to

permit adoption, with the concurrent termination of preexisting parental rights,

---

[100] *See id.*; *see also In re Ann S.*, 202 P.3d 1089, 1101 (Cal. 2009).

[101] 405 U.S. 645 (1972).

[102] 455 U.S. 745 (1982).

without requiring a finding of parental unfitness, violates the parent's right to due process."[103] Chief Judge Newman, who authored the court's opinion, explained:

> The Supreme Court cases invoked by appellant are either inapposite or consistent with the constitutionality of the D.C. statute. *Stanley v. Illinois* . . . established that a natural father, even of an illegitimate child, has the right to a due process hearing (applying the substantive state law) before his rights are terminated. However, appellant's claim is not founded on procedural, but *substantive* due process – a challenge to the best interest standard. Contrary to appellant's suggestion, *Stanley* does not stand for the proposition that the father of an illegitimate child has a constitutional right to block adoption unless he is unfit. Lack of fitness was an essential finding in that case only because *under state law*, that was the only basis for granting an adoption without parental consent even when the parents were married.
>
> \* \* \*
>
> Finally, in *Santosky v. Kramer*, . . . the Court held that procedural due process requires findings based on clear and convincing evidence before parental rights are terminated. In that case, under applicable state law, parental fitness was the test. However, the Court carefully refrained from any constitutional holding regarding the substantive criteria, limiting its attention to the standard of proof.[104]

---

[103] *In re P.G.*, 452 A.2d at 1184.

[104] *Id.* at 1184-85 (footnotes omitted).

This court has adhered to Chief Judge Newman's analysis in a myriad of decisions in the ensuing three-and-a-half decades, and no party or *amicus* in the present case has questioned it. Our colleagues in the majority have not refuted it. And the Supreme Court itself has confirmed our understanding that *Stanley* and *Santosky* were *not* substantive due process cases and did *not* hold that the Constitution requires a finding of parental unfitness in TPR cases. First, when presented with this precise substantive due process claim in *Caban v. Mohammed*,[105] the Supreme Court declined to reach it and signaled that *Stanley* did not settle the question.[106] Thereafter, in *Santosky* itself, the Court expressly

---

[105] 441 U.S. 380 (1979).

[106] The Supreme Court stated:

> Finally, appellant argues that he was denied substantive due process when the New York courts terminated his parental rights without first finding him to be unfit to be a parent. *See Stanley v. Illinois*, 405 U.S. 645 [] (1972) (semble). Because we have ruled that the New York statute is unconstitutional under the Equal Protection Clause, we similarly express no view as to whether a State is constitutionally barred from ordering adoption in the absence of a determination that the parent whose rights are being terminated is unfit.

*Id.* at 394 n.16. "Semble" is a term "used chiefly to indicate an obiter dictum in a court opinion or to introduce an uncertain thought or interpretation." *Semble*, BLACK'S LAW DICTIONARY (10th ed. 2014).

acknowledged that it still was not "clear" whether a State constitutionally could terminate a parent's rights without showing parental unfitness.[107] It would be quite surprising were it otherwise, for the Supreme Court normally refrains from deciding momentous constitutional issues when they are not presented or it is unnecessary to do so in the case before it. This court should exercise similar restraint.

**B. The Vital Interests of Neglected Children, Including Their Interests in Maintaining Intimate Familial Relationships With Their Foster Parents, Take Precedence Over Their Biological Parents' Interests.**

Surely "the most obvious . . . basis for denying custody to a fit parent in the best interests of the child would be a finding based on clear and convincing evidence that parental custody would actually harm the child."[108] That is why we have held that parental rights may be terminated even without a showing of

_____

[107] *Santosky*, 455 U.S. at 760 n.10.

[108] *Appeal of H.R. (In re Baby Boy C.)*, 581 A.2d 1141, 1178-79 (D.C. 1990) (Ferren, J., concurring).

unfitness where "exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest."[109]

We would adhere to this long-settled position. The reason parental "fitness" is important is precisely because the term "refers to the parent's intention and ability over time to provide for a child's wellbeing and meet the child's needs,"[110] as "determined by reference to the specific child whose placement is in issue."[111] Parental unfitness can be established by evidence that returning a particular neglected child to the parent's care and custody would seriously harm that child, regardless of why that would be so.[112] "The same statutory factors that guide the

_____

[109] *In re S.L.G.*, 110 A.3d at 1286 (internal quotation marks omitted).

[110] *Id.* at 1286.

[111] *Id.* at 1286 n. 26 (citing *In re L.W.*, 613 A.2d 350, 360 n.24 (D.C. 1992)). This relationship between parental fitness and the child's best interest is the reason why "the question of parental fitness is almost always at the heart of any proceeding to terminate parental rights or waive a natural parent's consent to adoption," and why the court must make a "threshold determination" as to whether the strong presumption in favor of the natural parent is rebutted by a showing of either unfitness or exceptional circumstances. *Id.* at 1286, 1288.

[112] *See id.* at 1287 ("[I]f the natural parent is unable . . . to meet the child's critical needs . . . , or if placement of the child with the natural parent would endanger the child or be detrimental to the child's wellbeing, that would mean the parent is unfit to care for that child.").

court's determination of a child's best interest in a TPR or contested adoption proceeding therefore also guide the court's assessment in that proceeding of the natural parent's fitness *vel non*."[113]  Clearly, the question of whether a parent is unfit overlaps substantially the question of whether regaining custody of her child is in the child's best interest.[114]

The possibility that termination of a putatively "fit" biological parent's rights would be justified, indeed necessary, to protect a previously abused or neglected child from "actual harm" is emphatically *not* an unrealistic "scenario." This court and other courts have confronted such "scenarios" repeatedly in real life.  They have arisen most commonly, perhaps, in cases involving young children who, after having been removed from abusive or neglectful parents for their own

---

[113]  *Id.*

[114]  *See also, e.g.*, *In re Jayden G.*, 70 A.3d at 303 n.32 ("[P]arental fitness, exceptional circumstances, and the child's best interests considerations are not different and separate analyses.  The three concepts are fused together, culminating in the ultimate conclusion of whether terminating parental rights is in a given child's best interests.") (internal quotation marks and citation omitted); *In re K.M.M.*, No. 91457-4, 2016 Wash. LEXIS 1003, at *37 (Wash. Sept. 8, 2016) ("[I]n order to determine whether a parent is a fit parent *to a particular child*, the court must determine that the parent is able to meet that child's basic needs." (emphasis in original)).

safety, remained in foster care for protracted periods while the biological parents slowly took the steps necessary to rehabilitate themselves and evidence their fitness to care for the children. By that time, in some of these cases, courts have found that preserving the biological parents' rights would come at a high cost to the children, for it necessarily would entail disrupting strong attachments the children developed with foster caregivers who have become the only parents they have ever known. As child psychologists have testified in this and many other cases, severing those attachments would expose the children to serious and permanent behavioral, cognitive, and psychiatric damage.[115] There is nothing controversial about this testimony; the importance to a child's wellbeing of a healthy and undisrupted attachment to a primary caregiver has been well-studied and is widely accepted in the literature of child psychology.[116] That common-sense

---

[115] Often, moreover, the biological parent cannot parent the child properly because of the corresponding lack of attachment in their relationship. *See, e.g.*, *In re K.M.M.*, 2016 Wash. LEXIS 1003, at \*38 (upholding TPR based on evidence that biological parent would be unable to parent the child due to child's lack of attachment to him).

[116] *See* Ross A. Thompson, *The Development of the Person: Social Understanding, Relationships, Conscience, Self*, in 3 HANDBOOK OF CHILD PSYCHOLOGY, SOCIAL, EMOTIONAL, AND PERSONALITY DEVELOPMENT 24, 42-70 (William Damon *et al.* eds., 6th ed. 2006); Marsha B. Liss & Marcia J. McKinley-Pace, *Best Interests of the Child: New Twists on an Old Theme*, in PSYCHOLOGY AND LAW: THE STATE OF THE DISCIPLINE 341, 351-55 (Ronald Roesch *et al.* eds., 1999).

proposition is well-accepted in court decisions too, up to and including the present case. On numerous occasions, for example, this court has appreciated that "it would be 'ruthless beyond description' to take a child out of a loving home, when she had lived at that home for a substantial period of time as a result of her biological parents' inability or unwillingness to care for her."[117]

When faced with these unfortunate but all-too-realistic situations, this court and other courts have adhered to the principle that the child's best interest is the overriding consideration. They consistently have approved or authorized

_____

[117] *In re L.L.*, 653 A.2d 873, 883 (D.C. 1995) (citation omitted); *see also, e.g.*, *In re K.D.*, 26 A.3d 772, 779 (D.C. 2011); *In re J.G.*, 831 A.2d 992, 1002 (D.C. 2003).

While these may be the most commonly encountered situations in which returning an abused or neglected child to a reformed biological parent would be contrary to the child's wellbeing, we can envision others as well. Even when there is no showing of present parental unfitness, the child still may have unhealed emotional and psychological wounds and abiding anger and hostility due to the parent's prior mistreatment. Such a child may be completely opposed to being returned to her parent and desperate to avoid it. In such circumstances, it is quite foreseeable that, however "fit" the parent, an attempt at reunification might prove not only futile, but disastrous for the child. *See, e.g.*, *In re K.M.M.*, 2016 Wash LEXIS 1003, at *8-9, *20-21 (reunification found to be futile in light of child's fear and inability to "tolerate" interactions with her father and her adamant refusal to attend visitation sessions with him or engage in reunification efforts); *cf.* Elizabeth Bartholet, *Nobody's Children: Abuse and Neglect, Foster Drift, and the Adoption Alternative* 106-07 (1999) (hereinafter, Bartholet, *Nobody's Children*).

termination of the biological parents' rights when necessary to avoid causing the child severe emotional trauma and permanent psychological harm – despite or regardless of the biological parents' fitness.[118]  As one court confronted with this painful choice empathically said:

> There can be no solution satisfactory to all in this kind of case.  Justice to both mother and child, the desired objective, can only rarely be attained where, as here, the best interest of one is only achieved at the expense of the other.  Where courts are forced to choose between a parent's right and a child's welfare, they choose the child by virtue of their responsibility as parens patriae of all minor children, to protect them from harm.[119]

This may seem unfair to biological parents who eventually have rehabilitated themselves and might be said to meet criteria of "fitness" that would render them suitable parents for other children or under other circumstances.

---

[118]  *See, e.g.*, *In re C.L.O.*, 41 A.3d 502, 512-13 (D.C. 2012); *In re Baby Boy C.*, 630 A.2d 670, 683 (D.C. 1993); *see also, e.g.*, *In re K.M.M.*, 2016 Wash. LEXIS 1003, at \*3-4, \*38; *In re Alonza D.*, 987 A.2d 536, 547 n.9 (Md. 2010); *Charleston Cty. Dep't of Soc. Servs. v. King*, 631 S.E.2d 239, 243-44 (S.C. 2006); *L.G. v. State*, 14 P.3d 946, 950 (Alaska 2000); *In re Baby Boy Smith*, 602 So. 2d 144, 148-49 (La. Ct. App. 1992); *In re Colby E.*, 669 A.2d 151, 152 (Me. 1995); *In re Jasmon O.*, 878 P.2d 1297, 1311-12 (Cal. 1994); *In re J.C.*, 608 A.2d 1312, 1323 (N.J. 1992).

[119]  *In re R.*, 416 A.2d 62, 68 (N.J. Super. Ct. App. Div. 1980).

However, such parents cannot expect to resume their relationship with their child as if the abuse and neglect had never happened. The child may suffer lasting psychological trauma from the previous mistreatment and have developed a primary attachment to the foster caregivers. Severing that attachment and returning this child to the parents who harmed her may entail an unacceptable risk of psychological injury to the child despite the parents' good faith efforts to overcome the past and achieve reunification. When that is so, a court may have no choice but to terminate the parents' rights in order to safeguard the child's welfare.[120]

This is not to deny or minimize the "fundamental liberty interest" that biological parents have in "the care, custody, and management" of their children.[121] But the parents are not the only parties with vital interests at stake in these child placement decisions. The Supreme Court has long recognized that children too are

---

[120] *See In re Jasmon O.*, 878 P.2d at 1313-14 (rejecting the argument that because the government "caused the child to be placed in a foster home, created the child's bonds to the foster parents, and disrupted the child's potential bond with the father, it would be fundamentally unfair to terminate the father's parental rights even if it would be detrimental to the child to be returned to his care.").

[121] *Santosky*, 455 U.S. at 753.

protected by the Constitution and possess constitutional rights.[122]   Just as adults

have a well-established, fundamental liberty interest in preserving their intimate

familial and caregiving relationships from harmful state interference and

destruction,[123] so too do children for whom such relationships are at least as

important.[124]  Consequently,

_____

[122]   *E.g.*, *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976) (children's substantive due process right of access to abortion) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority.  Minors, as well as adults, are protected by the Constitution and possess constitutional rights."); *In re Gault*, 387 U.S. 1, 13 (1967) ("[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone."); *see also Parham v. J.R.*, 442 U.S. 584 (1979) ("[A] child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment[.]"); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07 (1969) (First Amendment right to political speech).

[123]   *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2599 (2015) ("[C]hoices concerning . . . family relationships . . . are protected by the Constitution[.]"); *Santosky*, 455 U.S. at 753 ("[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment."); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-20 (1984) (discussing the constitutional protection accorded "choices to enter into and maintain certain intimate human relationships," in particular "[f]amily relationships [that,] by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.").

[124]   *See Santosky*, 455 U.S. at 754 n.7 (recognizing that "important liberty interests of the child and its foster parents may also be affected" by a TPR proceeding); *Troxel*, 530 U.S. at 88 (Stevens, J., dissenting) ("While this Court has not yet had occasion to elucidate the nature of a child's liberty interests in preserving established familial or family-like bonds, . . . it seems to me extremely

(. . . continued)

> [a] parent's rights with respect to her child have . . . never been regarded as absolute, but rather are limited by the existence of an actual, developed relationship with a child, and are tied to the presence or absence of some embodiment of family. These limitations have arisen, not simply out of the definition of parenthood itself, but because of [the Supreme] Court's assumption that a parent's interests in a child must be balanced against the State's long-recognized interests as *parens patriae . . . and, critically, the child's own complementary interest in preserving relationships that serve her welfare and protection.*[125]

In short, notwithstanding the troublingly scant recognition of the vital interests (and, arguably, constitutional rights) of children in our colleagues' opinions, the Constitution obliges us to "reject any suggestion that when it comes to parental rights, children are so much chattel."[126]

---

(….continued)

likely that, to the extent parents and families have fundamental liberty interests in preserving such intimate relationships, so, too, do children have these interests, and so, too, must their interests be balanced in the equation."); *see also, e.g.*, *In re Jasmon O.*, 878 P.2d at 1307 ("Children, too, have fundamental rights – including the fundamental right to be protected from neglect and to have a placement that is stable and permanent. Children are not simply chattels belonging to the parent, but have fundamental interests of their own that may diverge from the interests of the parent.") (internal punctuation and citations omitted).

[125] *Troxel*, 530 U.S. at 88 (Stevens, J., dissenting) (emphasis added, internal citations omitted).

[126] *Id.* at 89.

To enlarge on a previous point, for a young child who was removed from parents who neglected or abused her and placed for a lengthy time in foster care, it may become "natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family."[127]  When that happens, the child's vital interest in preserving familial relationships that serve her welfare and protection is often in maintaining her relationship with the foster family rather than, and in preference to, reunifying with the biological parents who abused or neglected her.  Ultimately it must be recognized that "[p]arental rights do not spring full-blown from the biological connection between parent and child.  They require relationships more enduring."[128]  A *genuine* parent-child relationship deserves protection whether biological or not; more so, if push comes to shove, than a superficial parent-child relationship that happens to be biological in origin.

---

[127] *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 844 n.52 (1977).

[128] *Caban v. Mohammed*, 441 U.S. 380, 397 (1979) (Stewart, J., dissenting).

Ordinarily, in the family law context, "the parameters of legal discourse have been based on parents' rights to their children instead of on a child's right to be parented."[129] This is because it usually is valid to "presum[e] that fit parents act in the best interests of their children."[130] But this is only a presumption, albeit a strong one. It is not always true, and it is rebuttable.[131] Children's separable interests come to the fore when it becomes clear, commonly in the wake of a finding of neglect and a disagreement over placement, that a parent's liberty interests are not necessarily aligned with her child's. This, after all, is why courts appoint guardians *ad litem* for the children and apply the "best interest of the child" standard in such cases. Put differently, respecting biological parents' interests to the exclusion of the children's is tantamount to assuming that their interests are always aligned. That assumption is both logically erroneous and

---

[129] Matthew M. Kavanagh, *Rewriting the Legal Family: Beyond Exclusivity to a Care-Based Standard*, 16 Yale J.L. & Feminism 83, 124 (2004).

[130] *Troxel*, 530 U.S. at 68 (plurality opinion).

[131] *See Parham v. J.R.*, 442 U.S. 584, 602 (1979) ("The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children. As with so many other legal presumptions, experience and reality may rebut what the law accepts as a starting point; the incidence of child neglect and abuse cases attests to this.") (citation omitted).

contrary to legislative policy determinations inherent in fashioning a "best interest of the child" standard in the first place.

Consequently, where the interests of child and parent are in fundamental conflict, the rights of the parents must be understood in light of the duty of the state, in its role of *parens patriae*, to defend and vindicate the child's rights – "to guard the general interest in youth's well being."[132]

In our view, therefore, taking the vital interests of the child into consideration, the threat of harm to a child can take precedence over a biological parent's interest in preserving the parent-child relationship, regardless of whether the parent is (otherwise) "fit" to regain custody of the child. If any of our colleagues in the majority disagree, and are of the view that the Constitution

_____

[132] *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). *See, e.g.*, *Gomes v. Wood*, 451 F.3d 1122, 1128 (10th Cir. 2006) ("[T]he parents' liberty interest is not absolute. States have a *parens patriae* interest in preserving and promoting children's welfare, *Santosky*, 455 U.S. at 766, . . . including a traditional and transcendent interest in protecting children from abuse[.]" (internal quotation marks omitted)); *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1019 (7th Cir. 2000) ("[The] liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents.") (quoting *Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123, 1125 (3rd Cir. 1997)).

compels a court to preserve a parent-child relationship despite clear and convincing evidence that doing so will prove harmful to the child's welfare, we think they need to say so and defend that position rather than dismiss the danger as only an unrealistic or theoretical possibility.

## IV.  A Parental Preference for an Adoption Petitioner Must Be Rejected When It Is Contrary to the Child's Best Interest.

We agree with the majority of our colleagues that the trial court properly fulfilled its obligation under our existing case law to give "weighty consideration" to the biological parents' choice of adoption petitioner, and that the court did not err in rejecting that choice as clearly contrary to the children's best interests because it would pose "unacceptably grave" risks to the children's psychological, intellectual, and social development. *Ante* at 53.  Judges Beckwith and Easterly criticize this court's "weighty consideration" doctrine and argue that if parents have not been found to be unfit, their preference for an adoptive placement of their child should not merely receive "weighty consideration," but "should presumptively control," subject only to the statutory requirements for the approval of all adoptions set forth in D.C. Code § 16-309 (b) (2012 Repl.).  *Post* at 155-57. On that premise, our two dissenting colleagues would reverse the trial court because, "[i]n the absence of any concerns about [the aunt]'s competence as a

caregiver, [the parents'] choice should have been honored" despite the trial court's finding of its injuriousness to the children. *Post* at 157. We disagree with that conclusion on both statutory and constitutional grounds.

First, as a statutory matter, D.C. Code § 16-309 (b) requires a court to be "satisfied" not only that the petitioner is competent to be the prospective adoptee's caregiver, but also that "the prospective adoptee is physically, mentally, and otherwise suitable for adoption by the petitioner," and that "the adoption will be for the best interests of the prospective adoptee."[133] These requirements focus on whether the adoption would be good for the child. They are not satisfied where, as here, the trial court finds, by clear and convincing evidence, the very opposite – i.e., that the adoption would be harmful to the mental health of the prospective adoptees and therefore contrary to their best interests. The law of the District of Columbia does not permit a court to approve an adoption that it finds would be injurious to the child's welfare.

---

[133] D.C. Code § 16-309 (b)(1), (3).

Second, for many of the same reasons we have already discussed in Part III of this opinion, we are confident that nothing in the Constitution requires the court to order an adoption that it finds would be clearly harmful to a child merely because the parents who support the adoption have not been found unfit. A valid finding of injuriousness rebuts the presumption that ostensibly fit parents act in their children's best interests; and the *parens patriae* powers of the state to limit and override "parental decisions [that] will jeopardize the health or safety of the child" are beyond dispute.[134]

On a separate point, however, we do agree with Judges Beckwith and Easterly (though our reasons are not the same as theirs). We, too, think that our judge-made "weighty consideration" doctrine is problematic, at least as it is currently articulated and applied in contested adoption proceedings. In an appropriate case – one in which "weighty consideration" leads the trial court to defer to the parent's choice when, in the child's best interest, it otherwise would not do so – we would favor re-examination of the doctrine.[135]

---

[134] *Wisconsin v. Yoder*, 406 U.S. 205, 234 (1972).

[135] The separate opinion of Judges Beckwith and Easterly refers to "this
(. . . continued)

Our "weighty consideration" rule requires that when there are competing

adoption petitions, the one favored by the child's biological parent must prevail

unless the court finds by clear and convincing evidence (rather than the usual

preponderance-of-the-evidence standard) that the parent's choice is "*clearly*

*contrary* to the child's best interest."[136]  The parent is entitled to this heavy thumb

on the scales as long as her parental rights are still intact when the adoption

proceeding commences, unless the court finds that the parent is not "competent" to

make a decision about the child's caregiver.[137]  This remains so even though the

court finds the parent in that proceeding to be unfit and enters an order terminating

her parental rights in conjunction with the order granting an adoption.  This

"weighty consideration" requirement seems to be unique to the District of

---

(….continued)
court's implicit decision to retain (at least for now) the weighty consideration test." *Post* at 141.  To be clear, we think no decision has been made to retain the weighty consideration doctrine; rather, the concurring and dissenting opinions show that a majority of the court is skeptical of the doctrine.

[136]  *In re K.D.*, 26 A.3d 772, 778 (D.C. 2011) (internal quotation marks omitted).  This is a deviation from the usual rule that "[i]n the case of a contested adoption between two non-parents, the ultimate decision on whether granting a petition serves the adoptee's best interests is made by the preponderance of the evidence."  *In re T.J.L.*, 998 A.2d 853, 860 (D.C. 2010) (quoting *In re J.D.W.*, 711 A.2d 826, 830 (D.C. 1998)).

[137]  *In re T.J.*, 666 A.2d 1, 11 (D.C. 1995).

Columbia; no Supreme Court precedent requires it, and other jurisdictions do not appear to accord any special weight to the biological parent's preference in determining which adoption petition is in the child's best interest.[138]

The "weighty consideration" rule requiring a court to approve an adoption petition unless clear and convincing evidence shows it to be *clearly contrary* to the child's best interest, and regardless of better alternatives, is problematic in a number of respects. It conflicts not only with D.C. Code § 16-309, but also with the principle that the child's best interest is the *paramount* consideration in adoption decisions, and it ignores the vital interests of the child. The rule is "premised on the notions that natural parents have a 'fundamental liberty interest . . . in the care, custody, and management of their child[ren]' and they do not lose their constitutionally protected interest in influencing their child's future 'simply because they have not been model parents or have lost temporary custody

_____

[138] *See Adoption of Hugo*, 700 N.E.2d 516, 521 & n.9 (Mass. 1998) ("[An adoption] plan proposed by a parent is not entitled to any artificial weight in determining the best interests of the child. . . . Presented with more than one potential adoption placement, the judge's task is to determine which plan will serve the best interests of the child, not to afford any particular weight to either plan.") (internal quotation marks omitted); *see also In re David H.*, 39 Cal. Rptr. 2d 313, 323 (Ct. App. 1995) ("[W]e are aware of no authority which allows parents who face a probable termination of their rights to condition acquiescence in the termination upon a right to designate or influence the adoptive placement.").

of their children.'"[139]  But biological parents *do* lose all these interests when their rights are formally terminated; the termination decree divests them of all legal rights, powers and privileges with respect to their child, including any right to object to the child's adoption or participate in any way in the adoption proceedings.[140]  That being so, it is difficult to see why the court must give special weight to the preference of a parent whose rights are about to be terminated once and for all during the contested adoption proceeding (especially, one would think, when the termination is based on a finding of unfitness).  It similarly is difficult to see why the parent's preference regarding this most critical decision as to the child's future should be entitled to special weight no matter how ill-informed, unconcerned, or prejudiced the parent is about the child's needs and the adoption petitioners' capabilities.

A parental preference for adoption by a family member may raise particular concerns, especially when (as in the present case) there are indications that the

_____

[139]  *In re T.W.M.*, 964 A.2d 595, 602 (D.C. 2009) (quoting *Santosky*, 455 U.S. at 753).

[140]  D.C. Code § 16-2361 (2012 Repl.).

family member will be unable to protect the child from the parents.[141] The law of the District of Columbia does not incorporate a kinship preference in contested adoption proceedings.[142] Hence, the "weighty consideration" doctrine is not supported by any legal preference for relatives over non-relatives in those proceedings. Rather, in the absence of such a thumb on the scales, what governs in any choice between adoption by a relative or by a non-relative is simply the child's best interest.

_____

[141] *See* Bartholet, *Nobody's Children* 89-93 (discussing the risks and benefits of kinship care).

[142] Maintaining a child in his or her home or that of a relative is a "first priority" when making decisions about *foster care*, *see* 29 DCMR § 1642.1 ("Placement Considerations for Foster Care"), but there is no comparable prioritization favoring relatives in the counterpart regulation listing "Placement Consideration[s] for Adoption," *see id.* § 1633. As the majority notes, *see ante* at 35 n.26, the CFSA's Permanency Planning Policy prioritizes adoption by kin as a permanency goal over adoption by non-kin, but this is merely internal agency policy that does not have the force of law and, though it may be entitled to some deference and respect, is not entitled to the same sort of deference from the courts as formal agency adjudications and rule-making. *See, e.g.*, *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Nunnally v. District of Columbia Metro. Police Dep't*, 80 A.3d 1004, 1012 & n.17 (D.C. 2013). Indeed, the Permanency Planning Policy explicitly recognizes that "[a]doption by kin may be established as the primary goal by the Court *if it is determined to be in the child's best interests*." CFSA, Permanency Planning Policy (May 25, 2011), Part VII, Procedure G: Adoption by Kin, ¶ 2 (emphasis added).

These and similar considerations, on which this court has not focused, are what lead us to think that the full court should re-examine our "weighty consideration" doctrine. Doing so can and should await a case in which application of the doctrine makes a difference to the outcome and in which we have the benefit of full briefing by the litigants. For now, it suffices to say that the trial court in the present case certainly gave the parents' preference the deference required by our current law, and that any error in so doing did not affect the outcome.

## V. Conclusion

Together with other judges making up a majority, we hold that the trial court properly relied on the attachment study and the expert testimony regarding the harmfulness of severing the children's attachments to their foster parents. We are satisfied that clear and convincing evidence supported the trial court's findings that the foster parents' adoption petition was in the children's best interests and that their aunt's petition, though preferred by the children's biological parents, was clearly contrary to their best interests. The en banc court therefore affirms the trial court's decision to grant the foster parents' petition.

We would stop there. Unfortunately, our colleagues do not. Let us inventory their principal missteps, to all of which we object. First, in spite of the collateral order doctrine and on dubious factual premises unsupported by the record, they overrule *In re K.M.T.* to permit interlocutory appeals of permanency goal changes. We fear that these appeals will prove to be disruptive, time-consuming, of scant legitimate benefit to the biological parents, and detrimental to the best interests of the children involved in them. Second, misreading Supreme Court precedent, disregarding decades of settled case law, and minimizing what is at stake for the abused and neglected children who will be affected, the majority declares that parental rights may not be terminated without a predicate finding of parental unfitness. Although our colleagues acknowledge that even a fit parent's rights may be terminated in order to protect the child's welfare in exceptional circumstances, they dismiss this possibility as hypothetical despite abundant evidence to the contrary. Third, and most ironically given our colleagues' concern with procedural fairness, they raise and decide constitutional questions without giving notice to the litigants or affording them the opportunity for briefing. This is contrary to settled norms of appellate adjudication – norms that we follow, of course, for the express purpose of ensuring procedural fairness. Fourth, our colleagues' most basic error is in undertaking to decide the foregoing issues at all,

for they all have been waived or forfeited, they are not properly before us in this case, and they make no difference to its outcome. Regrettably, our colleagues disregard well-established limits on judicial authority.

The full ramifications of our colleagues' actions remain to be seen, and certainly many questions have been left unanswered. We fear, however, that the majority's unnecessary, legally flawed holdings will prove detrimental to the welfare of abused and neglected children in the District of Columbia.

We respectfully dissent.

BECKWITH and EASTERLY, *Associate Judges*, with whom WASHINGTON, *Chief Judge*, joins in Parts I and II, concurring in part and dissenting in part: We join the court's holding that permanency goal changes (1) must be supported by a sufficient record developed at an evidentiary hearing and (2) are immediately appealable. As a majority of this court explains, permanency goal changes from reunification to adoption must be adequately litigated and immediately appealable because the courts have a critical role to play to ensure that the District—having

been authorized to remove a child from her parents based on a determination of past neglect and with the presumptive understanding that removal is temporary and that the child should be returned—does not give up on parents too soon. Parents have a constitutionally protected right to have a relationship with their children, and before a court issues a final order authorizing the District to redirect its efforts to dissolve the parent-child relationship and cultivate a new, government-sanctioned parental substitute, the court must ensure that the District has met its statutory obligations to expend reasonable efforts under the circumstances to reunify a child in the neglect system with his or her family.[1]

We also join the court's related holding that the District must show by clear and convincing evidence that a parent is unfit before her relationship with her child may be involuntarily terminated absent as-yet-undefined "truly exceptional

_____

[1] We express concern, however, about delay in the judicial review of permanency goal changes. The majority offers summary review procedures as a means of minimizing the delay in this court. Certainly we need to do what we can to accelerate review and resolution of these cases. Streamlining review procedures in this court will not, however, minimize the time it takes to litigate these matters in Superior Court. Currently, magistrate judges conduct evidentiary hearings pursuant to Family Court Rule D (c) and issue final orders of the court. These orders and judgments must then be reviewed by an associate judge of the Superior Court before they can be appealed to this court. D.C. Code § 11-1732 (k) (2012 Repl.); *see, e.g.*, *In re S.L.G.*, 110 A.3d 1275, 1285 (D.C. 2015) (noting the path to appellate review in that case). As a result, it may take years before a notice of appeal is filed transferring jurisdiction to this court.

circumstances," *ante*, at 54, and that, as a constitutional matter, it is not enough to assess only the best interests of the child as our termination of parental rights (TPR)[2] and adoption[3] statutes (as the latter provision has been interpreted by this court) direct.[4]

_____

[2] D.C. Code § 16-2353 (2012 Repl.).

[3] D.C. Code § 16-304 (e) (2012 Repl.).

[4] In this regard, even our colleagues who dissent as to the need for a predicate unfitness determination concede that an assessment of parental fitness is critical and that a trial court "*must* make a 'threshold determination' as to whether the strong presumption in favor of the natural parent is rebutted by a showing of either unfitness or exceptional circumstances." *Ante*, at 117 n.111 (emphasis added) (quoting *In re S.L.G.*, 110 A.3d at 1286, 1288); *see also ante*, at 102 (indicating that it is "ordinarily true" that "the substantive due process right of an individual" to parent her child "may not be terminated without a predicate finding by clear and convincing evidence that the individual is unfit to parent"). Given that the District's termination and adoption-without-consent statutes are silent on the subject of fitness, the partial dissent appears to recognize that courts must evaluate parental fitness in order to protect the "fundamental liberty interest" that parents have "'in the care, custody, and management' of their children"—a liberty interest the partial dissent expressly does "not [] deny or minimize." *Ante*, at 122 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).

Still our colleagues in partial dissent assert that the judicially determined best interests of the child are "paramount." *See, e.g.*, *ante*, at 108, 132. Apart from relying on this court's case law and the District's termination of parental rights statutes, neither of which can trump the constitutionally compelled fitness inquiry, they defend terminating parental rights solely on a consideration of the best interests of the child by stating in a footnote that "parental 'fitness' *should be* defined as coextensive with the child's best interests." *Ante*, at 105 n.84 (emphasis added). They do not explain how they reconcile this definition with Supreme Court case law, *see infra*, which clearly distinguishes between the threshold

(. . . continued)

We write separately to emphasize that these procedural protections are compelled by Supreme Court precedent recognizing the substantive due process right of parents to maintain their relationships with their children and keep their families intact. We also write separately to highlight the inadequacy of the District's TPR and adoption statutes. Passed in 1977 and 1963 respectively, these statutes do not reflect modern Supreme Court precedent recognizing that the Constitution requires a showing of unfitness by clear and convincing evidence as a prerequisite to legal dissolution of the parent-child relationship. Not only do the statutes fail to require a determination of parental unfitness at some point in termination or adoption-without-consent proceedings, they fail to mention fitness altogether. Thus they do not define what constitutes parental unfitness. They say nothing about who must prove unfitness and by what measure. And they do not specify when such fitness determinations should be made. In these and other respects, the District's statutes stand in poor contrast to other states' statutes establishing procedures for termination of the parental-child relationship and for

_____

(….continued)

parental fitness inquiry—i.e., whether the parent is able to provide adequate care for the child—and the question of what is "best" for the child.

Our colleagues in partial dissent also argue that the "right to parent one's child is not a right to harm one's child." *Ante*, at 106. But the harm they posit is the harm of returning a child to her fit parents. This is not a constitutionally cognizable harm, and there is no authority for the radical expansion of government intervention in the lives of families that these colleagues favor.

adoption without consent. The result is that our statutes do not with sufficient clarity protect the constitutional rights of parents to maintain their relationships with their children without government interference. Nor do they address critical policy issues, such as the preference, if any, to be given to kinship adoptions. These are matters for the legislature, not the judiciary, to address. We urge the Council of the District of Columbia to reassess and revise the District's TPR and adoption statutes.

As to this court's implicit decision to retain (at least for now) the weighty consideration test, we dissent. Not only does this test lack clarity and force, it cannot be reconciled with this court's clear holding that a parent's rights may not be terminated absent a determination of unfitness and, correspondingly, with the presumption that a parent who has not been deemed unfit makes decisions in the best interests of the child. Thus, if a parent has not been determined to be unfit, her choice of adoptive placement should not merely be given "weighty consideration." It should presumptively control.

## I.    A Showing of Unfitness by Clear and Convincing Evidence as a Constitutional Prerequisite to Termination of a Parent's Rights

With this opinion, a majority of the en banc court definitively holds that before the rights of a parent who has grasped her opportunity interest may be involuntarily terminated either directly or indirectly via adoption without consent, the District must prove the parent's unfitness by clear and convincing evidence. In so holding we build on recent acknowledgments by this court that a showing of unfitness is an essential part of the termination inquiry,[5] and we overrule prior pronouncements that proof of unfitness is not constitutionally required to permanently sever an existing parent-child relationship—that all that is needed is a showing that termination is in the best interests of the child.[6]  Supreme Court precedent compels this change in our law.[7]

_____

[5]  *See ante*, at 41 (discussing *In re S.L.G.*, 110 A.3d 1275 (D.C. 2015), and *In re G.A.P.*, 133 A.3d 994 (D.C. 2016)); *see also In re J.J.*, 111 A.3d 1038, 1044-45 (D.C. 2015) (acknowledging the parental presumption and the centrality of a fitness determination); *In re D.S.*, 88 A.3d 678, 681 (D.C. 2014) (same).

[6]  We acknowledge that there might be "truly 'exceptional circumstances'" where termination is permissible notwithstanding a parent's fitness. *Ante*, at 54 (brackets omitted). The "exceptional circumstances" language that this court endorsed in *In re S.L.G.* appears to come from a Maryland statute that incorporates a Maryland common law rule predating the Supreme Court decisions discussing the relationship between fitness and termination of parental rights. *See In re*

(. . . continued)

As the Supreme Court explained in *Troxel v. Granville*, the government presumptively has no authority to intervene in parent-child relationships:

> "[O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations. . . .
>
> Accordingly, so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

(….continued)

*S.L.G.*, 110 A.3d at 1286 (quoting *In re Rashawn H.*, 937 A.2d 177, 189-90 (Md. 2007) (citing Md. Code, Fam. Law § 5-323 (2007), which specifically provides that a court can grant guardianship without parental consent if it finds that the parent is unfit or "exceptional circumstances" exist)); *see also Ross v. Pick*, 86 A.2d 463, 468 (Md. 1952) (noting that parents "are ordinarily entitled to [] custody" unless they are unfit or "some exceptional circumstances render such custody detrimental to the best interests of the child"). There is no express support for this safety valve in the Supreme Court case law, but as that precedent does not plainly foreclose this safety valve, it is theoretically possible that it exists.

[7] Our colleagues in partial dissent rely on this court's earlier decisions pronouncing that the best-interests-of-the-child inquiry is controlling. As we are sitting en banc, however, we are not bound by this precedent. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). And given that these decisions fail to adequately protect the constitutional rights of a parent who has not been found unfit, as recognized by the Supreme Court, *see infra* at 141-49, we must disavow them.

530 U.S. 57, 68-69 (2000) (quoting *Parham v. J.R.*, 442 U.S. 584, 602 (1979)) (brackets in original). In this same body of precedent to which the Court in *Troxel* alluded, the Court has made clear that a parent's relationship with her child enjoys intertwined substantive and procedural due process protection, and thus that this relationship may not be involuntarily, permanently terminated absent a showing by clear and convincing evidence of parental unfitness.[8]

In *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Court acknowledged that the substantive due process guarantees of the Fourteenth Amendment include the right to "establish a home and bring up children." *Id.* at 399. And *Prince v. Massachusetts*, 321 U.S. 158 (1944), stated that "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* at 166. Accordingly, in *Stanley v. Illinois*, 405 U.S. 645 (1972), the Court held that as "a matter of due process of law," a parent is "entitled

---

[8] Our colleagues in partial dissent seek to distinguish between discussions of procedural due process rights and substantive due process rights, *ante*, at 113-16, but as the former flow from the latter in this context, both are implicated, *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 842 (1977) (acknowledging that parental rights are "afforded both substantive and procedural protection"). And the fact remains that the Supreme Court has identified a showing of unfitness as the constitutional prerequisite to the termination of an existing parent-child relationship.

to a hearing on his fitness . . . before his children [are] taken from him." *Id.* at 649.

The Court noted that a parent's right to raise his own children is "essential" and "substantial" and deserving of deference "absent a powerful countervailing interest." *Id.* at 651-52. Although the Court acknowledged the state's interest in protecting the wellbeing of children, it pronounced that "the State registers no gain towards its declared goals when it separates children from the custody of fit parents." *Id.* at 652. The Court thus held that "the Due Process Clause mandates" an individualized hearing to assess a parent's fitness "when the issue at stake is the dismemberment of his family."[9] *Id.* at 658.

Five years after *Stanley*, the Court shed more light on the constitutional nature and bounds of the familial liberty interest in *Smith v. Org. of Foster Families for Equal & Reform*, 431 U.S. 816 (1977). The Court distinguished

---

[9] Our colleagues in partial dissent highlight this court's examination of *Stanley* in *In re P.G.*, 452 A.2d 1183, 1184 (D.C. 1982), and quote its pronouncement that "[l]ack of fitness was an essential finding in [*Stanley*] only because *under state law*, that was the only basis for granting an adoption without parental consent." *Ante*, at 114. But this is not what *Stanley* said, as other courts have recognized. *See, e.g.*, *In re Sanders*, 852 N.W.2d 524, 533 (Mich. 2014) (explaining that "[t]he rule from *Stanley* is plain: all parents 'are constitutionally entitled to a hearing on their fitness before their children are removed from their custody'" (quoting *Stanley*, 405 U.S. at 658)).

between the substantive rights of "natural" families[10] not to be dismantled and the rights of individuals serving as foster parents to keep in their care children with whom they may have formed strong emotional bonds.[11]  The Court determined that the same substantive and procedural protections owed to the former were not owed to the latter.  *Id.* at 842-51.  The next year, in *Quilloin v. Walcott*, 434 U.S. 246 (1978), the Court rejected the due process claim of a non-custodial father who objected to the adoption of his child by the child's mother's partner.  On the one hand, the Court observed that a non-custodial parent who has not taken affirmative steps to claim parentage of the child and raise him or her will not be granted the substantive due process protections that a "family unit already in existence" will enjoy.  *Id.* at 255.  On the other hand, the Court, quoting Justice Stewart's

_____

[10]  Although families with same-sex partners had yet to be validated as such, the Court explained that its concept of a "natural" family was not limited to biological ties, but rested also on "intrinsic human rights," such as the right to marry and have children.  *Smith*, 431 U.S. at 845; *see also Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).  In addition, the Court contrasted the natural family with the relationship between a foster parent and a child in her care, which "derives from a knowingly assumed contractual relation with the State."  *Smith*, 431 U.S. at 845; *see also id.* at 844 n.51 (acknowledging adoption "as the legal equivalent of biological parenthood").  When we use the term "natural family," we understand it to have this broader meaning.

[11]  The development of strong emotional bonds between foster parents and the children in their care is unquestionably a good thing.  But these bonds cannot, as our colleagues in partial dissent argue, be elevated over natural familial relationships such that their preservation justifies terminating a fit parent's constitutional rights.  *See ante*, at 116-28.

concurrence in *Smith*, stated that it had "little doubt that the Due Process Clause would be offended 'if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'"[12] *Id.* (quoting *Smith*, 431 U.S. at 862-63 (Stewart, J., concurring in judgment)).

Then, in 1982, the Supreme Court decided *Santosky v. Kramer*, 455 U.S. 745 (1982), holding unconstitutional a New York statute permitting termination of

---

[12] Our colleagues in partial dissent assert that this proposition—that a best-interests-of-the-child test cannot be employed to break existing parental bonds—has no application to this case or in any case where there has been a determination of neglect and the child has been temporarily removed from the parent's care, because in such cases the parents "do not have an unbroken custodial relationship with the child." *Ante*, at 112 (emphasis omitted). There is no support in the Supreme Court's case law for the proposition that a single determination of neglect, made only by a preponderance of evidence, suffices to change the constitutional calculus for termination of parental rights. Indeed, the Supreme Court rejected this proposition in *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also supra* at 146-47. The only circumstance in which the Court has indicated that parental rights are diminished is in cases where, as in *Quilloin*, the parent has been absent from the child's life and failed to grasp the opportunity to form a familial bond with the child. *See Lehr v. Robertson*, 463 U.S. 248, 261 (1983) (explaining that the "difference between the developed parent-child relationship that was implicated in *Stanley* and *Caban* and the potential relationship involved in *Quilloin* and this case, is both clear and significant"). Moreover, while there may be "truly exceptional circumstances" under which a fitness inquiry can be circumvented, we are confident that a determination of past, temporary neglect is not one of them.

the parental rights of a father who had been found to have "permanently neglected" his child by only a preponderance of the evidence. *Id.* at 768. The Court held that permanent neglect had to be proven by clear and convincing evidence before a parent's rights could be terminated. *Id.* at 769. The Court explained that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Id.* at 753. To the contrary, because the right to parent one's children is "an interest far more precious than any property right" and because the termination of that right "work[s] a unique kind of deprivation," protection of that right by a high evidentiary standard was necessary. *Id.* at 758-59.

*Santosky* was centrally focused on the state's burden of proof, but there was never any serious question that what had to be proved by clear and convincing evidence was some type of unfitness, in that case "permanent neglect."[13] The Court observed that, although the precise issue of fitness was not presented by that case, it was not at all "clear that the State constitutionally could terminate a

---

[13] Permanent neglect was statutorily defined as more than a year-long period during which "the child's natural parents failed substantially and continuously or repeatedly to maintain contact with or plan for the future of the child although physically and financially able to do so." *Santosky*, 455 U.S. at 748.

parent's rights *without* showing parental unfitness." *Id.* at 760 n.10 (citing *Quilloin*, 434 U.S. at 255). But *Stanley* had already established that the essential predicate to a person's parental rights is his or her fitness to parent. *See* 405 U.S. at 651-52; *see also id.* at 657-58. Moreover, elsewhere in *Santosky* the centrality of fitness was accepted as a given: the Court noted, for example, that the termination of parental rights "entails a judicial determination that the parents are unfit to raise their own children." 455 U.S. at 760. It also observed that, "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Id.* *Santosky*, in conjunction with *Stanley*, makes clear that for the state to terminate parental rights consistent with the Constitution, a determination of unfitness by clear and convincing evidence must be made.

In short, in every case of the last fifty years addressing the termination of parents' substantive due process rights, the Supreme Court's "threshold focus"[14] has been parental fitness.[15] With our decision in this case, this court aligns our law

_____

[14] Annette R. Appell & Bruce A. Boyer, *Parental Rights vs. Best Interests of the Child: A False Dichotomy in the Context of Adoption*, 2 DUKE J. GENDER L. & POL'Y 63, 68 (1995).

[15] Our colleagues in partial dissent cite *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2579 (2013), for the proposition that the Court endorsed the

(. . . continued)

with Supreme Court precedent (and with the laws of other states[16]) and acknowledges fitness as the constitutional dividing line: parents who have not been deemed unfit have a substantive due process right to parent their children; they are accorded broad authority over their children and are presumed to act in their children's best interests. *Troxel*, 530 U.S. at 68. This right may be temporarily restricted if it is determined by a preponderance of the evidence that a

---

(….continued)
constitutionality of a best-interests-of-the-child test for the termination of parental rights under the Indian Child Welfare Act of 1978. *Ante*, at 109-11. But not only was no constitutional challenge raised in that case, that statute does not employ a best-interests-of-the-child test. Rather, to advance its goal of reducing "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption . . . usually in non-Indian homes," Congress mandated that parental rights of Native Americans could not be terminated absent a "heightened showing," above and beyond that of unfitness proved by clear and convincing evidence, that the parent's continued custody of the child would, beyond a reasonable doubt, result in "serious emotional or physical damage." *Adoptive Couple*, 133 S. Ct. at 2557-58; *see also id.* at 2579 (Sotomayor, J., dissenting) (explaining that the ICWA imposes a "more demanding [standard] than the showing of unfitness under a high 'clear and convincing evidence' standard, [which] is the norm in the states" for termination decisions); *id.* at 2583 n.14 (emphasizing that the ICWA "is more protective" of parent's rights).

[16] *See ante*, at 39-40 n.33. Indeed, we were able to find only one other state—New Jersey—that appears to allow termination of parental rights based only on the best interests of the child. *See* N.J. Stat. Ann. 30:4C-15.1. Further research reveals, however, that (1) New Jersey's "best interests" inquiry focuses solely on the abilities of the parent, and thus is effectively a fitness inquiry, and (2) the New Jersey Supreme Court has held that consideration of a TPR petition must include "an evaluation of parental unfitness." *N.J. Div. of Youth & Family Servs. v. G.L.*, 926 A.2d 320, 325 (N.J. 2007).

child was abused or neglected while in the parent's care. *See Stanley*, 405 U.S. at 658. In that scenario, the child may be removed from the parent's home for a limited time. But consistent with the Constitution, a parent's relationship with her child may not be permanently severed unless and until the District has proved unfitness by clear and convincing evidence. *Santosky*, 455 U.S. at 769.

## II. The Inadequacy of the District's Statutes and the Need for Legislative Action

Although this court has now recognized that parental rights may not be terminated without a determination of parental unfitness, the fact remains that our TPR and adoption statutes make no mention of this constitutional marker. It is an omission that only lends itself to confusion—confusion that should not be tolerated given the magnitude of the issues at stake. Moreover, this statutory silence leaves unanswered a number of related policy questions that are for the Council, not this court, to address.[17]

---

[17] The termination procedures of other states may be a helpful reference point for the Council. *See ante*, at 39-40 n.33.

Preliminarily, there is the question of how to define unfitness. As this court

acknowledged in *In re S.L.G.*, 110 A.3d at 1286, and in contrast to other states,[18]

the D.C. Code currently contains no reference to unfitness. We tried to fill this

statutory gap in *In re S.L.G.* by noting that "[b]roadly speaking . . . fitness refers to

the parent's intention and ability over time to provide for a child's wellbeing and

meet the child's needs. . . . [It] turns, in other words, on whether the parent is, or

within a reasonable time will be, able to care for the child in a way that does not

endanger the child's welfare." *Id.* at 1286-87. We thus indicated that a trial court

must assess, as a threshold matter, the parent's ability to function as such. It

should not consider whether removing the child from the foster parents who now

seek to adopt would disrupt the child's continuity of care,[19] or whether the adoptive

parents are comparatively more healthy (physically, mentally or emotionally) than

_____

[18] Other jurisdictions have legislatively defined parental unfitness. Common statutory grounds include a failure to rectify the conditions that caused the child to be adjudicated neglected ("permanent neglect") despite the state's reasonable efforts toward reunification, sexual abuse, abandonment of the child, long-term mental illness or deficiency of the parent, long-term alcohol- or drug-induced incapacity of the parent, failure to support or maintain contact with the child, conviction for qualifying serious crimes, such as rape or murder, or involuntary termination of the rights of the parent to another child. *See* Child Welfare Information Gateway, *Grounds for Involuntary Termination of Parental Rights* (2013), https://www.childwelfare.gov/systemwide/laws_policies/statutes/groundtermin.pdf.

[19] A consideration under D.C. Code § 16-2353 (b)(1).

the birth parents.[20]   The District's statutory scheme should make that clear.   It should also concretely define what constitutes unfitness.

Furthermore, there is the question of precisely when an express fitness assessment must be made; in particular, whether such an assessment should be made in a separate proceeding that precedes consideration of any adoption petition. Relatedly, the Council should clarify that the District bears the burden of establishing unfitness by clear and convincing evidence.   Currently, it appears to be common practice for the District to move to terminate parental rights in compliance with the timetable set by ASFA and incorporated by the D.C. Code;[21] but if CFSA succeeds in recruiting an adoptive parent, the District's practice is to move to hold the termination petition in abeyance pending the litigation of the adoption-without-consent petition.   In so doing the District offloads the burden of terminating parental rights to the adoptive parents.   This creates an unseemly situation where a private third party is petitioning the courts both to destroy the parent's rights and to present herself as a viable parental alternative.   The District should not be permitted to enlist private proxies to do the parens patriae work of the government.   Rather, if the District wants a child to be eligible for adoption, it

_____

[20]   A consideration under D.C. Code § 16-2353 (b)(2).

[21]   *See ante*, at 27-30.

must bear the full burden of demonstrating that a parent's relationship with her child should be severed.

Lastly, now that this court has recognized that a showing of unfitness is required to terminate directly or indirectly a parent's relationship with her child, the Council should clarify how a best-interests-of-the-child analysis interacts with a fitness determination. For example, some states base termination decisions solely on a determination that a statutory ground of unfitness has been proved, without additional regard for the best interests of the child.[22] Other states require proof of unfitness as a threshold matter and treat the best interests of the child as an additional inquiry—thus allowing a court to preserve an unfit parent's rights if it believes that termination would not be in the child's best interests.[23]

_____

[22] *See, e.g.*, Fla. Stat. § 39.806; La. Child. Code Ann. art. 1015; N.H. Rev. Stat. Ann. 170-C:5.

[23] Some states simply permit courts to consider the best interests of the child as an additional factor. *See, e.g.*, Alaska Stat. § 47.10.088, -.011; Ariz. Rev. Stat. § 8-533; Colo. Rev. Stat. § 19-3-604; 705 Ill. Comp. Stat. 405/1-2; Iowa Code § 232.116; Minn. Stat. 260C.301; Mont. Code Ann. § 41-3-609; N.M. Stat. Ann. 32A-4-28; N.Y. Soc. Servs. Law § 384-b; 23 Pa. Cons. Stat. § 2511. Other states require an explicit determination that termination is in the child's best interests. *See, e.g.*, Conn. Gen. Stat. § 17a-112; Ga. Code Ann. § 15-11-310; Haw. Rev. Stat. § 571-61 to -63; Me. Rev. Stat. tit. 22, § 4055; Mich. Comp. Laws § 712A.19b; Mo. Rev. Stat. § 211.447; N.C. Gen. Stat. § 7B-1110, -1111; Ohio Rev. Code Ann. § 2151.414.

It is this court's role to ensure that our statutory scheme for terminating the relationship between a parent and her child passes constitutional muster. By recognizing that unfitness is a prerequisite for such a termination decision, this court has fulfilled its role. But we acknowledge that we leave behind a statute that does not clearly align with the holdings of this case, and that leaves unanswered a number of questions regarding how and when unfitness should be assessed. These are questions for the Council to address in the course of reevaluating the District's statutory scheme.

### III.    Weighty Consideration

We dissent from this court's implicit retention of the weighty consideration test from *In re T.J.*, 666 A.2d 1, 12 (D.C. 1995). Four judges of this court state that this test equates to a procedural requirement that there be "'clear and convincing' evidence that the custody arrangement preferred by the parents would clearly be contrary to the best interests of the child." *Ante*, at 45. Clear and convincing evidence of the relative measure of the "best" interests of a child is a nebulous standard, and, standing alone, it provides weak protection for parents' rights. But it is particularly feeble protection in light of the assertion that evidence indicating that "breaking the children's attachment to [the non-preferred caregiver]

would significantly harm them" is a "significant consideration in the weighty consideration analysis." *Ante*, at 51 & n.39. In Superior Court, the conflicts about who should adopt a child almost always arise when the choice is between the parent's preferred custodian and the foster parent. Yet it is almost certain that a child will have developed emotional ties to the foster parent with whom she has been living and who wants to adopt her. And it is equally certain that the "significant consideration" afforded to these emotional ties—particularly when such ties are presented in the form of expert "attachment" or "bonding" studies—will cancel out the "great weight" of the parental preference, as is true for the majority in this case.

In addition to the inherent weakness of the weighty consideration test, we have a more fundamental concern: preservation of this test cannot be reconciled with the majority's holding that determinations of unfitness must precede adoption-without-consent decisions. The majority holds that parents who have not been deemed unfit cannot have their rights terminated, directly or indirectly through adoptions without consent. *Ante*, at 38-44, 55. But if parents have not been deemed unfit, their decisions about the adoptive placement of their child

should presumptively control.[24]   *See ante*, at 38 n.30 (acknowledging the presumption that fit parents act in the best interests of their children).   In other words, the weighty consideration test gives too little protection to parents who have not been proven unfit and whose authority to make decisions for their children is still constitutionally protected.[25]   The parents in this case fall in this category.   They were never determined to be unfit.   They chose E.A., a relative who was already fostering A.L.'s and Ta.L.'s half-brother, to be the adoptive mother of A.L. and Ta.L.   In the absence of any concerns about E.A.'s competence as a caregiver, that choice should have been honored.

*          *          *

---

[24]   Subject to the requirements of D.C. Code § 16-309 (b) (listing criteria for court approval of all adoptions).

[25]   Meanwhile, if a parent has been deemed unfit, the parent does not have a constitutionally protected right to choose her child's adoptive parent or to have her preference be given any weight.   Thus the weighty consideration test gives too much, as a constitutional matter, to parents who have properly been found unfit.

Constitutional rights aside, the Council could decide to give preference to the parental choice, even if the parent has been deemed unfit and his constitutional rights have been terminated.   But that is another policy decision that is beyond the authority of this court to make.

We summarize our points of agreement and disagreement with our colleagues. We agree with our colleagues in the majority that permanency goal change orders from reunification to adoption are immediately appealable to this court, with the focus of the trial court litigation, as well as our appellate review, on the District's efforts to reunify the family. We also agree that a parent's rights may not be terminated directly or indirectly by means of adoption without consent, unless and until the District proves that the parent is unfit by clear and convincing evidence. We disagree with our colleagues in the majority, however, that this court can or should retain our weighty consideration test from *In re T.J.*, and we dissent from that portion of the opinion. Consequently, we also dissent from the court's ultimate judgment affirming adoption of the children by R.W. and A.W. Finally, we urge the Council to revisit the District's termination and adoption statutes, to align them with the dictates of the Constitution, and to address the many policy questions that our concurrence has highlighted.